**Pedro ARROYO, Petitioner-Appellee,**

**v.**

**Everett JONES, Superintendent, Great Meadow Correctional Facility, and Robert Abrams, Attorney General of the State of New York, Respondents-Appellants.**

**No. 1267, Docket 82–2072.**

United States Court of Appeals, Second Circuit.

Argued June 17, 1982.

Decided July 23, 1982.

Certiorari Denied Nov. 29, 1982.
See 103 S.Ct. 468.

John D. B. Lewis, New York City (William E. Hellerstein, The Legal Aid Society, New York City, on the brief), for petitioner-appellee.

Mark Dwyer, New York City (Robert M. Morgenthau, Dist. Atty. for New York County, Amyjane Rettew, New York City, on the brief), for respondents-appellants.

Before OAKES, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

The State of New York appeals from an order of the United States District Court for the Southern District of New York, Robert J. Ward, Judge, 534 F.Supp. 980, granting the petition of state prisoner Pedro Arroyo for a writ of habeas corpus on the ground that the state trial judge's supplemental jury charge, that "people are presumed to intend the natural, probable and logical consequence of their acts," unconstitutionally deprived Arroyo of the presumption of innocence, in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We modify and affirm the order of the district court.

### FACTS

Arroyo was convicted in 1973, after a jury trial in New York State Supreme Court, of one count of attempted murder, three counts of assault, and one count of possessing a weapon. Two versions of the events leading to the charges against Arroyo emerged at the trial. According to the prosecution's witnesses, on April 13, 1972, Arroyo was apprehended by two New York City police officers shortly after leaving the scene of a robbery. He was being returned to the scene of the robbery when he broke free from the officers and ran. He was quickly pursued by a third officer, Raymond Bernard, who attempted to tackle him. Arroyo dodged the tackle, drew a revolver, and fired at Bernard. Bernard had drawn his own handgun and extended his right arm into a firing position. Arroyo's shot, from five feet away, struck and shattered the grip of Bernard's gun, and the spent bullet pierced Bernard's police jacket but not his chest. Bernard returned fire; Arroyo leaped over a car hood and fired at Bernard twice more, missing both times. The police officers eventually wounded Arroyo, who thereupon surrendered.

Arroyo testified that his memory of the events was sketchy because of the injuries he had sustained. He recalled having been accosted by a gun-wielding stranger who had a second gun in his waistband. He stated that he had immediately pushed aside and held the man's gun hand, grabbed the other gun from the man's belt, struck him with that gun, and fled. As he ran, he was shot and wounded. Arroyo testified that he had no recollection of ever firing a gun. Two other defense witnesses also testified that Arroyo had not fired a gun and that all of the shooting had been done by the police officers.

When the trial judge instructed the jury, before discussing any of the charges specifically, she instructed the jury that the prosecution bore the burden of proving every element of every alleged crime beyond a reasonable doubt. As to the attempted murder count, the judge stated that the "intent to cause the death of Raymond Bernard" was an essential element of the crime, and defined intent without using any language that could have been interpreted

as shifting the burden of proof.[1] The same unobjectionable instruction as to intent was given twice more with respect to other counts. These initial instructions are unchallenged.

Several times during the course of its deliberations, the jury made inquiries of the trial judge. First, it asked to have the testimony of Officer Bernard reread. The second request, made approximately four hours after the deliberations had begun, was for "the law and the interpretation of the [attempted murder] charge." The trial judge repeated, in large part, her initial instructions concerning that count, including the proper instructions on intent. After deliberating for another two hours, the jury returned to ask, "[d]oes shooting at a policeman necessarily constitute attempt[ed] murder?" The trial judge responded as follows:

[T]he law which defines murder and attempt mentions only persons as to the elements of that crime, it applies to all persons.

Attempted murder is defined in the law, a person is guilty of attempted murder[,] and I am combining the statute on attempt as well as murder[,] when with intent to cause the death of another person he attempts to cause the death of such person.

(Tr. 808.) The jury returned to the jury room, but returned twelve minutes later, some six and one-half hours after it had begun deliberations, with another inquiry, as follows:

We have reached agreements on four charges and divided on the fifth one, to assist us with the latter, we would seek further classification [*sic*] of the words conscious intent.

(Tr. 810.) The parties are in accord that the charge on which the jury had not reached agreement was that of attempted murder.

The trial judge conferred with the prosecutor and defense counsel before responding. The prosecutor suggested that the jury be instructed that "people are presumed to intend the natural, probable and logical consequence of their acts." Arroyo's lawyer stated that he had no objection. The trial court then gave the following supplemental instruction:

Now, Members of the Jury, a person acts intentionally with respect to attempting to cause death or injury to another person, when the alleged perpetrator's conscious objective is to cause such death or injury.

Intention is a subjective thing and depends on the operation of the individual's mind, nonetheless, it is possible to make a finding of intention based on the objective actions of the individu[al].

The Penal Law defines intentionally as follows: a person acts intentionally with respect to a result or conduct described by a statute to finding [*sic*] an offense when his conscious objective is to cause such result or to engage in such conduct.

*By agreement, I can tell you that people are presumed to intend the natural, probable and logical consequence of their acts.*

---

1. The trial judge's instruction on intent was as follows:

What is intent; under our law, a person acts intentionally with respect to attempting to cause the death of another person when the alleged perpetrator's conscious objective is to cause such death. This portion of my charge is concerned itself only with the attempt to commit the crime of murder based on the intention to cause the death of a victim, of course, we all recognize that an intention is a subjective matter and it depends on the operation of an individual's mind none the less it is possible to make a finding of intention based on objective actions of the alleged perpetrator; in fact, this

is the only method that we can use in determining intention since we cannot get into the mind of the alleged perpetrator. Therefore, in your deliberation, you may use the defendant's objective action as a determining factor in deciding whether or not he acted intentionally.

You may also refer to all the other evidence which may indicate intent or not indicate intent. The Penal Law of the State of New York defines intentionally as follows: a person acts intentionally with respect to a result or conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct. ·

(*Id.*; emphasis added.) Twenty-five minutes later the jury returned a verdict of guilty on all counts.

Arroyo perfected his appeal to the Appellate Division in 1977. He argued that, although the portion of the supplemental charge italicized above represented a correct statement of New York law,[2] the presumption language denied him due process of law by nullifying the prosecution's duty to prove intent and shifting to him the burden of proof on that issue on the attempted murder count. The Appellate Division unanimously affirmed Arroyo's conviction for attempted murder; it dismissed the remaining four counts because they had merged with the attempted murder count. Leave to appeal to the New York Court of Appeals was denied.

In October 1979, a few months after the United States Supreme Court's decision in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, Arroyo pursued his due process claim in New York State Supreme Court by moving pursuant to New York Criminal Procedure Law § 440.10 to vacate the judgment of conviction. The State opposed the motion on the ground that Arroyo's failure to object at trial to the presumption instruction constituted a forfeiture of the claim. The court rejected this argument, but denied the motion on its merits, on the ground that

> in the totality of the entire charge and the detailed instructions to the jury in this case [the presumption language] did not have the same potential for impermissible burden shifting as the instruction struck down by the Supreme Court in [*Sandstrom v. Montana, supra*].

(Opinion of May 19, 1980 at 14). Leave to appeal to the Appellate Division was denied, thus exhausting Arroyo's state court remedies.

Arroyo then commenced the present proceeding in the district court, seeking a writ of habeas corpus.[3] In an opinion dated February 11, 1982, the district court ruled that, under *Sandstrom v. Montana, supra*, the inclusion of the presumption language in the supplemental instruction on intent denied Arroyo due process. The court granted the writ, ordering that the State either release Arroyo from custody or retry him within sixty days. This appeal followed.[4]

## DISCUSSION

In *Sandstrom v. Montana*, which has been the subject of considerable recent discussion in this Court, *see, e.g., Ramirez v. Jones*, 683 F.2d 712 (2d Cir. 1982); *Rivera v. Coombe*, 683 F.2d 697 (2d Cir. 1982); *Mancuso v. Harris*, 677 F.2d 206 (2d Cir. 1982); *Nelson v. Scully*, 672 F.2d 266 (2d Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 2301, 73 L.Ed.2d 1304 (1982); *Washington v. Harris*, 650 F.2d 447 (2d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982), the United States Supreme Court ruled that a jury instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," violates the defendant's right to due process because it tends to shift the burden of proof on the issue of intent to the defendant and to deprive the defendant of the presumption of innocence. In the present case the State does not seriously contend that the portion of the supplemental instruction challenged

2. *Sandstrom v. Montana, supra,* was not to be decided for two years, and although following *Sandstrom* the New York Court of Appeals stated that the law of New York had long held the *Sandstrom*-type charge to be erroneous as a matter of state law, *People v. Thomas*, 50 N.Y.2d 467, 472, 429 N.Y.S.2d 584, 407 N.E.2d 430 (1980), there were a number of New York cases upholding similar presumption language, *see id.* at 474, 429 N.Y.S.2d 584, 407 N.E.2d 430 and cases cited therein (Fuchsberg, J., concurring).

3. In light of the state court's rejection of the State's procedural argument and its decision on the merits of Arroyo's due process claim, Arroyo's failure to object at trial to the presumption language does not bar federal review. *Engle v. Isaac*, —— U.S. ——, 102 S.Ct. 1558, 1575 n.44, 71 L.Ed.2d 783 (1982); *Washington v. Harris*, 650 F.2d 447, 452 (2d Cir. 1981).

4. Following the district court's decision, the parties agreed to a stay of the order pending a decision of this appeal, and Arroyo remains incarcerated.

by Arroyo—"people are presumed to intend the natural, probable and logical consequences of their acts"—is not the same type of instruction found invalid in *Sandstrom*.[5] Rather, it contends principally that, when read in light of the charge as a whole, as is required by *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), the presumption language did not have the effect of ·shifting the burden on intent to Arroyo and did not deprive him of the presumption of innocence. We reject the State's argument. In light of the special prominence of the presumption language by reason of its presence in a supplemental instruction, *see Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), and the series of questions from the jury that preceded it, we cannot conclude that the offending language was "harmless beyond a reasonable doubt," *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

In *Nelson v. Scully, supra*, we discussed thoroughly the need, in reviewing trial court instructions, not to view the improper language in isolation and to evaluate the charge as a whole, in order to determine whether the improper language " 'so infected the entire trial that the resulting conviction violates due process.' " 672 F.2d at 272 (quoting *Cupp v. Naughten, supra*, 414 U.S. at 147, 94 S.Ct. at 400). *Nelson* and the other cases heretofore considered by this Court in the wake of *Sandstrom* have dealt with offending language in the body of the court's principal (or only) charge, rather than in a supplemental charge such as that confronting us here.

A supplemental charge must be viewed in a special light. It will enjoy special prominence in the minds of the jurors for several reasons. First, it will have been the most recent, or among the most recent, bit of instruction they will have heard, and will thus be freshest in their minds. Moreover, it will have been isolated from the other instructions they have heard, thus bringing it into the foreground of their thoughts. Because supplemental instructions are generally brief ·and are given during a break in the jury's deliberations, they will be received by the jurors with heightened alertness rather than with the normal attentiveness which may well flag from time to time during a lengthy initial charge. And most importantly, the supplemental charge will normally be accorded special emphasis by the jury because it will generally have been given in response to a question from the jury. The particularly telling impact of a supplemental instruction—and especially the last such instruction—upon a jury was recognized in *Bollenbach v. United States, supra*, as follows:

The Government suggests that the judge's misconceived "presumption" was "just what it appears to be—a quite cursory, last minute, instruction on the question of the necessity of knowledge as to the stolen character of the· notes—and nothing more." But precisely because it was a "last minute instruction" the duty of special care was indicated in replying to a written request for further light on a vital issue by a jury whose foreman reported that they were "hopelessly deadlocked" after they had been out seven hours.... Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptionable and unilluminating abstract charge.

326 U.S. at 611–12, 66 S.Ct. at 405.

On the record before us there is every reason to believe that the court's presumption language made a special impression on the jurors. It was the last sentence they heard before returning for their final minutes of deliberation. It was a brief and pointed statement. And, most importantly, it gave them a way to decide the issue that had caused them, first, to ask for an interpretation of the original instructions on attempted murder, second, to ask if a shot at a police officer necessarily evinced an at-

**5.** In its Brief on Appeal at 13, the State says, "Certainly, it would have been preferable had the trial judge not included the quoted sentence in her instructions. *See Sandstrom v. Montana*, 442 U.S. 510 [99 S.Ct. 2450, 61 L.Ed.2d 39] (1979)." ·

tempt to murder, and third, to ask for "further cla[r]ification of the words 'conscious intent'." In light of this repeated questioning over the first six and one-half hours of deliberations, and in light of the jury's decision on the attempt count less than one-half hour after having heard the improper charge, it seems highly likely that the supplemental charge was in the forefront in the jurors' minds.

In these circumstances, we do not believe the trial court's initial unobjectionable charge on intent can be deemed to have cured the defective language in the supplemental charge. Since the initial instructions did not mention any presumption as to intent they did not give the jury any assistance in how to apply a presumption— whether they were free to disregard it, whether it was merely something they might infer, or whether the defendant had to overcome it. More importantly, the initial instructions cannot be deemed to have disinfected the later presumption language because the jury's questions reveal that the initial charge simply was not understood. In short, it is all very well as a general matter for the State to urge us to evaluate the effect of presumption language in light of the charge as a whole. But when the jurors have so little comprehended the unobjectionable initial charge that they have found it necessary to ask three times for clarification, it would be decidedly dense of us to assume that the unobjectionable initial charge, as to which enlightenment was requested, itself enlightened the jury as to the real meaning of the improper enlightenment.

We find no merit in the State's argument that the supplemental charge was not important because intent was not a hotly debated issue at trial. It is true that intent has been a more prominent issue in cases such as *Sandstrom*, in which the defendant admitted killing the deceased but pleaded lack of intent due to a mental disorder aggravated by alcohol consumption. Although subtler here, the issue as to intent to murder was highlighted by Arroyo's testimony that he had merely tried to protect himself by knocking Bernard aside and flee-

ing, and that he did not remember firing a gun. Thus the trial testimony raised a question as to intent, and the jury's inquiries during its deliberations reveal that it had substantial uncertainty as to whether the State had proven intent to murder beyond a reasonable doubt.

Nor do we find any of the State's other arguments more persuasive. For example, in contending that as a practical matter the presumption language probably had little effect, the State states that

[b]y the time the jurors heard this supplemental charge, they had already reached verdicts of guilty on four counts, and on three of those counts they had been required to find that Arroyo acted with a specific intent. Arroyo's theory that the jurors, who had three times properly found intent from the evidence without resort to a presumption, could have understood the supplemental charge as a direction *to ignore the evidence* about intent in reaching a verdict on the final count, is simply incredible.

(State's Reply Brief at 5; emphasis added.) This argument is wide of the mark, for what the sequence of events leads us to infer is not that the presumption language caused the jurors to "ignore the evidence about intent," but rather that it may have led them to *ignore their doubts* about that evidence. This argument by the State really amounts to a contention that the jury would not have resorted to the presumption because there was adequate evidence from which it could have found the requisite intent proven. The question, however, is not whether the jury *could* have convicted on the basis of the evidence without resort to the presumption, but whether we can be sure beyond a reasonable doubt that this is what it did. *Sandstrom v. Montana, supra,* 442 U.S. at 526, 99 S.Ct. at 2460. Obviously, in light of the jury's repeated requests for clarification and the relative speed of its decision after receiving the presumption language, "[i]t would indeed be a long jump at guessing to be confident that the jury did not rely on the erroneous 'presumption' given them as a guide." *Bollenbach v.*

*United States, supra,* 326 U.S. at 614, 66 S.Ct. at 406.

In sum, we agree with the conclusion of the district court that the presumption language of the trial court's supplemental charge was not harmless beyond a reasonable doubt and that the petition for habeas corpus should be granted.

## CONCLUSION

As noted above, the New York Appellate Division, on affirming Arroyo's conviction for attempted murder, set aside the convictions on the other four charges because they were lesser-included offenses which merged with the attempted murder conviction. The district court's decision granting habeas corpus was silent as to its effect on these extinguished lesser counts. Although we affirm the decision requiring the State to release or retry Arroyo for attempted murder within sixty days, we modify the order to permit the State to seek in state court the revival of the convictions on any of the four extinguished counts. As thus modified, the order of the district court is affirmed.