**Gerald Jerome ROCK,
Petitioner-Appellant,**

v.

**Phillip COOMBE, Jr., Superintendent,
Respondent-Appellee.**

**No. 369, Docket 82–2211.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 3, 1982.

Decided Dec. 2, 1982.

Certiorari Denied April 18, 1983.
See 103 S.Ct. 1773.

---

Alan C. Lippel, New York City, for petitioner-appellant.

Julie R. Fischer, Asst. Dist. Atty., Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty., Kings County, Barbara D. Underwood, Jane S. Meyers, Asst. Dist. Attys., Brooklyn, N.Y., on brief), for respondent-appellee.

Before TIMBERS, KEARSE, and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner Gerald Jerome Rock, a New York State prisoner convicted of second-degree murder, appeals from a final judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Chief Judge,* dismissing his petition for a writ of habeas corpus which contended, *inter alia,* that the trial judge's instructions to the jury, once in the main charge and twice in supplemental charges, that "a man is presumed to intend the natural consequences of his act," unconstitutionally shifted to Rock the burden of proof on the issue of intent. *See Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Although Rock had exhausted his state remedies as to this *Sandstrom* claim, his petition also presented other claims as to which he had not exhausted his state remedies. The district court dismissed the *Sandstrom* claim on its merits.

On this appeal we allow Rock to withdraw and abandon his unexhausted claims to comply with *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). On the merits of the *Sandstrom* claim, we affirm the judgment of the district court.

## I. BACKGROUND

In September 1975 Rock was convicted in New York State Supreme Court, Kings County, after a jury trial, of second-degree murder and was sentenced to a term of imprisonment of twenty years to life. The indictment charged that Rock, acting in concert with other persons, had intentionally caused the death of one James Gibbs, Jr., by striking, hitting, and beating him. At trial the State presented the testimony of four of Rock's acquaintances who were present at or participated in the attack on Gibbs. All four testified that Rock had hit Gibbs on the head repeatedly with a hammer. A hammer had been recovered by police at the scene of the crime, and the medical examiner testified that the cause of Gibbs's death had been a stab wound to the heart and massive injuries to the face and skull.

In defense, Rock contended that he had not caused Gibbs's injuries or death. He testified that he had never joined the melee in which Gibbs was attacked, that he had not had a hammer, and that he had never hit Gibbs or anyone else. Rock called as a witness his cousin Jerry Brown, who was then already imprisoned for the murder of Gibbs. Brown testified that it was he, and not Rock, who had hit Gibbs with the hammer.

### A. *The Trial Court's Instructions*

Notwithstanding his defense of nonparticipation, Rock requested the trial judge to instruct the jury on the crime of first degree manslaughter, a lesser-included offense within the crime of murder. Insofar as is pertinent to this case, a manslaughter charge under N.Y. Penal Law § 125.20 (McKinney 1975) requires proof of intent to cause serious injury but, unlike a murder charge under N.Y. Penal Law § 125.25 (McKinney 1975), does not require proof of intent to cause death.[1] The judge gave the requested instructions on manslaughter as an alternative to the second-degree murder count.

The court informed the jury that "[p]roof of intent to kill is a necessary element of the crime [of murder]," (Tr. 586), and instructed as follows on the element of intent:

Intent is the operation of the mind whereby a person aims to obtain the desired natural consequences or effect of his act. Intent is the state of mind with which an act is done, and it involves the use of the will. As we say, a mental operation cannot be photographed. It is silent and invisible to the human eye, but the intent of a person maybe [*sic*] ascertained from his conduct or speech or from a combination of both, and it is a general rule that a man's actions and outward manifestations reveal an expression of his mind, and it is not always by word alone that a man expresses his intention. *It is a fundamental rule of evidence that a man is presumed to intend the natural consequences of his act, unless the act is done under circumstances or under conditions which preclude the existence of such an intent.*

If you conclude that the defendant committed the acts charged, then you must decide whether or not from all of the established facts, speech, conduct and actions by the defendant, [h]e intended to effect the commission of this crime.

Under the Penal Law, the word "intentional" is defined as follows: "A man acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such results or to engage in such conduct."

---

1. New York Penal Law § 125.25 defines murder in the second degree, in pertinent part, as follows:

    A person is guilty of murder in the second degree when:

    1. With intent to cause the death of another person, he causes the death of such person or of a third person . . . .

New York Penal Law § 125.20 defines manslaughter in the first degree, in pertinent part, as follows:

    A person is guilty of manslaughter in the first degree when:

    1. With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . .

Now whether an intent to kill was formed is something that you must determine from all of the circumstances of this case. In connection with the element of intent to kill, you may consider the demeanor, the conduct and the action of the defendant surrounding the commission of the alleged acts as disclosed by the evidence.

(Tr. 586–88; emphasis added.) The italicized language forms the basis for Rock's *Sandstrom* claim. In describing the elements of manslaughter, the court also stated that "[i]t is not only the act; it is the intention that controls." (Tr. 592.)

Throughout his main charge the trial judge instructed the jury as to the nature of the prosecution's burden of proof. He repeatedly stated that the State had the burden of proof (*e.g.*, Tr. 581, 589–90, 592, 596), that its burden was to establish Rock's guilt beyond a reasonable doubt (*e.g.*, Tr. 581, 582, 584, 589, 593, 596, 611), and that the State bore this burden with respect to each and every element of the crime (*e.g.*, Tr. 589, 590, 592, 596), including expressly the element of intent (Tr. 589). The judge stated that the defendant was presumed innocent unless and until the State carried its burden of establishing guilt beyond a reasonable doubt. (Tr. 581, 593, 611.) The court reminded the jury that the jury was the trier of the facts. (Tr. 596–97.)

There was no objection to the intent portion of the court's instructions. Indeed, following the jury's departure, Rock's attorney stated, "The first thing I would like to do is to compliment Your Honor on what I consider to be a fair and decent and objective charge." (Tr. 612.)

## B. *The Supplemental Instructions*

The jury retired to deliberate on July 14, 1975, at 1:42 p.m. At 4:18 it returned to the courtroom with a request for a reading of the testimony of two witnesses: John Finley (one of the four who had testified that Rock repeatedly hit Gibbs with a hammer) and Jerry Brown (who had testified that he, and not Rock, had hit Gibbs with the hammer). After hearing the reading, the jury resumed its deliberations at 5:15.

At 9:30 p.m. the jury returned to the courtroom with another request, this time for "a reading of the Medical Examiner's testimony and that portion of the Judge's charge dealing with intent." (Tr. 620–21.) With respect to intent, the court responded as follows:

THE COURT: . . .

I told you previously that intent is the operation of one's mind; and in effect, intent is that state of mind with which an act is done and it involves the use of the will; and, of course, the intent of the person cannot be ascertained by any X-rays. It can be ascertained from the conduct or speech of an individual or from a combination of both, that is, the facts and circumstances surrounding the alleged act. That is what you would look to toward determining what the intention of a person is.

I told you that intent is an element of both counts of the indictment. Under the first count of the indictment it is necessary for the People to establish that it was the intention of the defendant acting in concert to cause the death of the deceased[,] that is, to kill the deceased.

Under the second count of the indictment there is no intent to kill but an intent to cause serious physical injury. And that would be under—I used the term "second count of the indictment." It is not actually the second count of the indictment. It is a lesser included offense of the first count of the indictment which is murder.

Does that satisfy the request or shall I continue further?

THE FOREMAN: If you can continue further, make it more clearer.

THE COURT: Again, as we say that a mental operation—and that is what the intent is—a mental operation that you determine from the facts and surrounding circumstances are such, something that cannot be photographed and is something is again invisible to the human eye and it is something that has to be deter-

mined from the surrounding circumstances or acts.

In regard to intent, I may add as I told you previously that a person is presumed to intend the natural consequences of his act unless the act was done under any circumstances or conditions which would preclude the existence of such an intent.

Intention, as I defined it, is, of course, a question of fact for you to determine within the legal guidelines that I am giving you. And again, intent is something that you have to determine from the circumstances of the case, from the speech and conduct of the defendant and others who allegedly—and the defendant and the surrounding circumstances attending the alleged crime.

And, in effect, keep in mind an intent is trying—I'm trying to give it in as clear-cut and layman language as I can—a person acts intentionally that is, performs an act intentionally when his conscious objective is to cause such result or to engage in such conduct.

And that is basically what the law defines as intent.

And again I advise you that it is a state of mind within which an act is done and it is for you to make that determination as to what the intent, if any, was from all of the surrounding circumstances. And in accordance with the law as I have given it to you, you are to, of course, utilize your experience and everyday common sense in making this evaluation in accordance with the guidelines that I have given you.

(Tr. 621–24.)

The jury retired to deliberate further at 9:48 p.m., but was immediately brought back at the request of defense counsel in order for the court to make clear that the State was required to prove intent beyond a reasonable doubt. The court stated to the jury as follows:

THE COURT: Let me add if I did not state it initially but I believe I had that intent is, of course, a necessary element both under the murder count and under the manslaughter count and I distinguish between the two different intents required, and, of course, intent is an element of both counts and the burden is upon the People to establish by proof beyond a reasonable doubt that this intent has been—rather, that the intention was present, specific intention that I outlined to you with regard to both murder and manslaughter.

(Tr. 625.) The jury resumed its deliberations at 9:52 p.m. and continued until 11:35 p.m. when court adjourned until 10:00 a.m. on July 15.

On July 15, the jury resumed deliberations. At 11:32 a.m. it returned to the courtroom with a "request [for] a reading of the judge's charge dealing with intent and the difference between Murder and Manslaughter, from the original transcript." (Tr. 630.) The court commenced by restating the difference between the intents required for manslaughter and murder, and then repeated virtually verbatim the intent portion of its main charge relating to murder, which we have quoted in part A above. There was no objection by Rock's counsel.

The jury resumed its deliberations at 11:41 a.m. At 4:55 p.m. it returned its verdict, finding Rock guilty of murder.

## C. Post-Conviction Proceedings in State Court

On his direct appeal to the Appellate Division of the Supreme Court, Rock challenged a number of aspects of his trial, but did not attack the trial court's instructions as to intent on the basis that they shifted the burden on that issue to him. His conviction was affirmed in 1976.

After the Supreme Court's 1979 decision in *Sandstrom v. Montana, supra,* Rock moved in state court pursuant to N.Y.Crim. Proc.Law § 440.10[1](h) (McKinney 1971) to vacate the judgment of conviction, asserting (1) a claim of prosecutorial misconduct in cross-examination and (2) a *Sandstrom* claim that the trial court's instructions on intent improperly shifted to Rock the burden on that issue. While finding that Rock was precluded from asserting his claims of

prosecutorial misconduct (either because they had been raised on direct appeal and thus could not be attacked collaterally or because they had not been raised on direct appeal and thus were waived), the court reached the merits of Rock's *Sandstrom* claim. The court found that the "instruction read in the entirety, made it abundantly clear that the burden of proof was not shifted to the defendant but was borne by the People requiring proof beyond a reasonable doubt as to every element of each crime involved," that Rock's guilt had been overwhelmingly established, and that any error in the charge had been harmless beyond a reasonable doubt. The court thus denied Rock's motion to vacate the judgment. Leave to appeal this ruling to the Appellate Division was denied.

### D. *The Present Habeas Proceeding*

In November 1981 Rock commenced the present proceeding seeking a writ of habeas corpus in the district court. In addition to the *Sandstrom* claim, the petition asserted claims of prosecutorial misconduct, improper denial of a continuance, erroneous refusal to instruct the jury on the crime of assault, and insufficiency of the evidence. The State, in addition to opposing the petition on its merits, contended that Rock had not exhausted his state remedies and that the petition should be dismissed under *Rose v. Lundy, supra.*

The district court declined to dismiss the petition on *Rose v. Lundy* grounds, stating that "[s]ince the only claim of substance is the [*Sandstrom* claim] and that has been exhausted, there is no point in sending the petitioner back to the state courts to pursue fruitless and time-exhausting remedies which will not affect the final result." District court memorandum dated May 3, 1982, at 3–4. Instead, the court dismissed the *Sandstrom* claim on its merits, ruling that Rock's trial defense had not placed intent in issue and concluding that, in the context of the trial court's repeated admonitions with respect to reasonable doubt and the State's burden of proof, "the *Sandstrom* 'error' does not appear to be misleading." *Id.* at 2. The district court did not mention the trial judge's repetition of the "*Sandstrom* error" in the two supplemental charges in response to questions from the jury. The court granted a certificate of probable cause, stating that "these *Sandstrom* cases raise difficult and subtle issues requiring an analysis of the facts in each case." *Id.* at 4.

### E. *Issues on this Appeal*

On this appeal we are presented with issues not only as to the merit of Rock's *Sandstrom* claim, but also as to the threshold question of whether, in light of *Rose v. Lundy, supra,* that claim may be adjudicated in this proceeding. Rock seeks to pursue in this Court only his *Sandstrom* claim, as to which both sides now agree that Rock has exhausted his state remedies.[2] Rock's present attorney, who is not the attorney who represented Rock in the district court, has advised this Court under oath that Rock wishes to withdraw and abandon his non-*Sandstrom* claims.[3] The State opposes any

---

**2.** The State originally contended, on the basis of incomplete records in the district attorney's files, that even the *Sandstrom* claim had not been exhausted and that Rock's pursuit of that claim was additionally barred by the doctrine of procedural default, *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Just prior to oral argument of this appeal the State obtained additional information and withdrew both of these arguments.

**3.** Rock's attorney's affidavit reads, in pertinent part, as follows:

3. As I stated to the Court, on June 28, 1982, in a meeting between Mr. Rock and myself, we agreed that the only claim to be pursued on appeal was the *Sandstrom* claim; the other claims were to be abandoned.

4. Furthermore, Mr. Rock in a letter to me dated October 22, 1982, advised me that he had requested the attorney who had represented him in the District Court "that those points [referring to the other four claims in the petition for a Writ of Habeas Corpus] be removed from the courts (sic) consideration."

5. Based on the aforementioned, Mr. Rock concurs with my statement at time of argument withdrawing and abandoning the four other claims contained in the Writ of Habeas Corpus.

(Affidavit of Alan C. Lippel dated November 4, 1982; bracketed and parenthetical material in original.)

withdrawal or abandonment of the unexhausted claims on appeal, preferring a dismissal of all claims pursuant to *Rose v. Lundy.*

We conclude that Rock may, consistent with *Rose v. Lundy,* abandon his unexhausted claims in this Court in order that we may adjudicate his *Sandstrom* claim; and we conclude that the *Sandstrom* claim lacks merit.

## II. ABANDONMENT OF UNEXHAUSTED CLAIMS

In *Rose v. Lundy, supra,* 102 S.Ct. 1198, 71 L.Ed.2d 379, the Supreme Court ruled that when a district court is presented with a habeas petition asserting both claims that have been and claims that have not been exhausted in state proceedings, the court "must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." *Id.* at 1199. The submission of a "mixed petition" does not automatically sound the death knell of the habeas proceeding since the petitioner is entitled to amend his petition to submit only exhausted claims. *Id.; see also id.* at 1204.

■ We do not construe the entitlement of the petitioner to narrow his petition, in order to submit only his exhausted claims, as a right encased in rigid formality. If a petitioner, either *pro se* or through his attorney, unequivocally acknowledged to the district court, either in writing, or orally on the record, that he was withdrawing and abandoning his unexhausted claims, we would see no reason to require the court to go through the jejune exercise of dismissing the petition and requiring that a new piece of paper be filed. Thus, had Rock unequiv-

ocally announced in the district court his abandonment of unexhausted claims as he has done here, we would construe *Rose v. Lundy* to have authorized the court to proceed to the consideration of the merits of Rock's exhausted claims.[4]

■ Nor do we read *Rose v. Lundy* as ruling that a petitioner's election to abandon his unexhausted claims may be made only in the district court. Plainly any such election should ordinarily be made at that level, because the district court should refuse to rule on any of the claims in a mixed petition. Where, however, the district judge has ignored the dictates of *Rose v. Lundy* and dealt with the exhausted claims on the merits, and where he has refused to hear the unexhausted claims, we consider it appropriate to permit the petitioner to withdraw and abandon his unexhausted claims at the appellate level.[5]

■ Here, in the face of Rock's express and unambiguous abandonment of his non-*Sandstrom* claims, no useful purpose would be served by refusing to hear the appeal until after a remand to the district court for entry of an amended petition excluding those claims. Such a remand would accomplish only the formalization of the abandonment of claims on which the district court has already refused to rule, in order to have that court reiterate its ruling on the exhausted claim it has already decided, with Rock returning to this Court to make the same arguments he pursues now.

Accordingly, we accept Rock's abandonment of his non-*Sandstrom* claims, and we proceed to the merits of the *Sandstrom* issue.

## III. THE SANDSTROM CLAIM

In *Sandstrom v. Montana, supra,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, the Supreme Court ruled that a jury instruction

4. The district judge was not, however, entitled to reach the merits of the *Sandstrom* issue in the posture of the case as it existed before him. *Rose v. Lundy* held that "a district court must dismiss habeas petitions containing both unexhausted and exhausted claims." 102 S.Ct. at 1205 (footnote omitted).

5. Where the petitioner has not clearly and unambiguously abandoned his unexhausted claims at either level, we have remanded to the district court for further proceedings in accordance with *Lundy. See Gulliver v. Dalsheim,* 687 F.2d 655, 659 (2d Cir.1982).

that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" violates the defendant's right to due process because it tends to shift to the defendant the burden of proof on the issue of intent and thereby to deprive him of the presumption of innocence. In the present case, the challenged language, stated to the jury three times, was that

> a man is presumed to intend the natural consequences of his act, unless the act is done under circumstances or under conditions which preclude the existence of such an intent.

(Tr. 587, 623, 632.) On the first and last occasions on which this presumption was stated, it was described as "a fundamental rule of evidence." (Tr. 587, 631.) The first portion of the statement appears to run afoul of *Sandstrom*. Although it is qualified to some extent by the clause beginning "unless," *see Washington v. Harris,* 650 F.2d 447, 453 (2d Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982), we do not regard that qualification as sufficient to cure the *Sandstrom* error.[6]

In order to determine whether the effect of the challenged language was to shift the burden on the intent issue to the defendant, we must evaluate the language in the context of the charge as a whole. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Nelson v. Scully,* 672 F.2d 266 (2d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2301, 73 L.Ed.2d 1304 (1982). Further, we must pay particular attention to the fact that the presumption language was twice repeated in supplemental instructions responding to the jury's requests for clarification on the issue of intent. *Bollenbach v. United States,* 326 U.S. 607, 611–12, 66 S.Ct. 402, 404–05, 90 L.Ed. 350 (1946); *Arroyo v. Jones,* 685 F.2d 35 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982).

In *Arroyo,* we considered the effect of a statement that "people are presumed to intend the natural, probable and logical consequences of their acts," which did not appear at all in the main charge, but rather was given as the final supplemental charge in response to a jury request for clarification of the words "conscious intent." Recognizing the particularly telling impact ordinarily made by a supplemental instruction, and especially the last such instruction, we stated as follows:

> A supplemental charge must be viewed in a special light. It will enjoy special prominence in the minds of the jurors for several reasons. First, it will have been the most recent, or among the most recent, bit of instruction they will have heard, and will thus be freshest in their minds. Moreover, it will have been isolated from the other instructions they have heard, thus bringing it into the foreground of their thoughts. Because supplemental instructions are generally brief and are given during a break in the jury's deliberations, they will be received by the jurors with heightened alertness rather than with the normal attentiveness which may well flag from time to time during a lengthy initial charge. And most importantly, the supplemental charge will normally be accorded special emphasis by the jury because it will generally have been given in response to a question from the jury.

685 F.2d at 39.

The mere fact that an erroneous statement appears in a supplemental charge, however, does not automatically mean that the jury has been unduly influenced by it. The supplemental charge itself should be viewed as a whole and the offending statement read in context in order to evaluate its likely effect on the jury.

---

**6.** The use of the word "preclude" in the ameliorating clause is itself troublesome. If, to avoid the presumption, the circumstances must *preclude* the presumed intent, it would appear that intent need not be proven beyond a reasonable doubt. An improved formulation would be that the jury

> may infer that a man intended the natural consequences of his act, unless the act is done under circumstances or under conditions that raise a reasonable doubt as to the existence of such an intent.

On the facts of *Arroyo,* there was every reason to believe that the court's presumption language had made a special impression on the jurors. It was a brief and pointed statement; it was unaccompanied by any qualifying language whatever; the supplemental charge was the first occasion on which the jurors had heard the presumption language; the presumption language was the last statement they heard before returning to deliberations; and after hearing it the jurors required less than one-half hour to reach a verdict on a question that obviously had been troubling them for the prior six and one-half hours.

We find the circumstances of the present case to be materially different.[7] The first statement of the presumption occurred in the main charge, during which the judge told the jury repeatedly that the burden was on the State to establish every element of its case beyond a reasonable doubt. Further, whenever the presumption language was used, whether in the main charge or the supplemental charges, it was in the midst of a balanced statement that intent was to be determined from conduct, speech, and all of the circumstances. Thus, in the main charge the challenged sentence was followed immediately by the statement that

> [i]f you conclude that the defendant committed the acts charged, then you must decide whether or not from all of the established facts, speech, conduct and actions by the defendant, [h]e intended to effect the commission of this crime.
>
> . . . .
>
> Now whether an intent to kill was formed is something that you must determine from all of the circumstances of this case.

(Tr. 587.) This was also, nearly verbatim, the concluding language of the second supplemental charge. (Tr. 632.)

In the first supplemental charge the challenged language was both preceded and followed by instruction that effectively nullified any burden-shifting effect. First, the court stated that intent

> can be ascertained from the conduct or speech of an individual or from a combination of both, that is, the facts and circumstances surrounding the alleged act. That is what you would look to toward determining what the intention of a person is,

(Tr. 621), and stated that

> it is something that has to be determined from the surrounding circumstances or acts.

(Tr. 622–23.) This immediately preceded the presumption language; and after the presumption sentence the court continued as follows:

> Intention, as I defined it, is, of course, a question of fact for you to determine within the legal guidelines that I am giving you. And again, intent is something that you have to determine from the circumstances of the case, from the speech and conduct of the defendant and others who allegedly—and the defendant and the surrounding circumstances attending the alleged crime.
>
> . . . .
>
> And again I advise you that it is a state of mind within which an act is done and it is for you to make that determination as to what the intent, if any, was from all of the surrounding circumstances.

(Tr. 623–24.) Finally, at Rock's counsel's request this statement was augmented two minutes later by a reiteration that the burden was on the State to establish the specific intent alleged beyond a reasonable doubt.

---

7. We do not, however, agree with the State's contention, relying principally on *Mancuso v. Harris,* 677 F.2d 206, 211 (2d Cir.1982), that the *Sandstrom* error was harmless because intent was not in issue in the present case. Although the evidence presented by Rock at trial did not place his intent in issue, that issue was placed before the jury by the court's acceding to Rock's request that the jury be instructed on the lesser-included offense of manslaughter. While the evidence and the charge, standing by themselves, might not persuade us that intent was in issue, we must recognize that intent was a factor that was troubling to the jury, which returned twice to the court with explicit requests for a rereading of the judge's "charge dealing with intent."

Thus, unlike the *Arroyo* jury, the jurors in the present case were never presented with a statement of a burden-shifting presumption that was particularly memorable either for its inclusion in a very brief statement, or for its isolation, or for its position as the last words given them prior to the resumption of their deliberations. Here, the judge ended each set of instructions impeccably: The end of the main charge contained language reminding the jury that the defendant is presumed to be innocent; the first supplemental charge ended with a reminder that the State bore the burden of proving intent beyond a reasonable doubt; and the final supplemental charge ended with the statement that intent was a matter for the jury to determine from all of the circumstances of the case.

Finally, unlike *Arroyo,* the timing in the present case of the jury's return with its verdict provides no basis for inferring that the jury seized upon the presumption language. Here, the last supplemental charge was given at 11:32 a.m., and the jury remained in deliberation for another five hours before returning its verdict of guilty.

In sum, in light of the court's constant reiteration that the burden remained on the State to prove each element of the crime beyond a reasonable doubt and that intent was to be determined from all of the circumstances, and in the absence of any basis for inferring that the jury fastened upon the presumption language instead of determining intent from all of the circumstances, we conclude that the *Sandstrom* errors were harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The judgment of the district court is affirmed. The mandate of this Court shall indicate that petitioner formally abandoned all but his *Sandstrom* claim.

No costs.