John MARTINI, Sr., Petitioner,

v.

Roy L. HENDRICKS, Administrator, New Jersey State Prison, and John L. Farmer, Jr., Attorney General, State of New Jersey, Respondents.

Civ. No. 99–4347 (WHW).

United States District Court, D. New Jersey.

March 15, 2002.

Alan Zegas, Chatham, NJ, Peter Garcia (Acting Public Defender), Mark H. Friedman, Theresa Yvette Kyles, Office of the Public Defender, Appellate Section, Newark, NJ, for Petitioner (Martini).

Marilyn Goceliak Zdobinski, Special Deputy Attorney General of the State of New Jersey, Office of the Attorney General, Trenton, NJ, Fred L. Schwanwede, Susan W. Sciacca, William H. Schmidt, Bergen County Prosecutor, Hackensack, NJ, for Respondents (State of New Jersey).

## OPINION

WALLS, District Judge.

Petitioner, John Martini, Sr. is currently on New Jersey's death row for kidnapping and murder. He now moves for writ of habeas corpus under 28 U.S.C. § 2254 on the following seven grounds [1]: (1) ineffective assistance of counsel for failure to investigate and use at trial certain mitigating evidence; (2) ineffective assistance of counsel for failure to find and use drug paraphernalia in the form of several burned screens in the guilt and penalty-phase trials; (3) violation of Petitioner's due process rights because of failure of the prosecution to turn over certain mitigating evidence discoverable under *Brady v. Maryland;* (4) violation of Petitioner's due process rights and right to an impartial jury for the wrongful exclusion of prospective jurors; (5) subjection to cruel and unusual punishment because of the trial court's refusal to instruct the jury as to N.J.S.A. 2C:11–3c(5)(g), that the Petitioner rendered substantial assistance to the state in the prosecution of another person for the crime of murder; (6) violation of the Petitioner's due process rights to a reliable sentencing proceeding and his subjection to cruel and unusual punishment because of the trial court's "erroneous" answer to the jury's question regarding mitigating evidence; (7) denial of Petitioner's due process rights because of state court's refusal to admit expert testimony during the post-conviction relief ("PCR") hearing.

The petition is denied on all grounds for the reasons stated below.

## FACTS AND PROCEDURAL HISTORY

In 1990, a Bergen County jury convicted Martini of the kidnapping and murder of Irving Flax, a Fairlawn, New Jersey business executive. The evidence at trial established that Martini, and his codefendant Therese Afdahl, abducted Flax and demanded ransom money from his wife. Although his wife paid the money, Martini nevertheless shot Flax three times in the back of the head and killed him.

During the trial, Martini did not dispute the fact that he kidnapped and fired the

---

1. Petitioner presented eight claims in his original petition. However, in Petitioner's recently filed Memorandum of Law, Petitioner withdrew a claim relating to the judge's failure to instruct the jury on the consecutive fifteen-year parole ineligibility period because of recent law that made Petitioner's argument moot.

three shots that killed Flax. Instead, he asserted a diminished capacity defense based on cocaine addiction. The jury rejected that defense at both the guilt and penalty-phase trials. Martini was then sentenced to death.

Martini's conviction and death sentence were upheld by the New Jersey Supreme Court on direct appeal, *State v. Martini,* 131 N.J. 176, 619 A.2d 1208 (1993) (*"Martini I"*), and on proportionality review, *State v. Martini,* 139 N.J. 3, 651 A.2d 949 (1994) (*"Martini II"*). After the United States Supreme Court denied Martini's petition for certiorari on October 2, 1995[2], the Superior Court, Law Division, issued a warrant scheduling Defendant's execution for November 15, 1995. On October 30, 1995, the Public Defender sought PCR review and a stay of execution on Defendant's behalf, even though Martini did not wish to file any further appeals. In response, the trial court entered a stay and appointed independent counsel to represent Martini. The court also appointed a psychiatrist to determine whether Martini was competent to waive PCR proceedings. Following a two-day hearing, the court concluded that Martini was competent, and that the Public Defender could not pursue PCR on Martini's behalf without his consent. The stay of execution was continued pending review by the New Jersey Supreme Court.

In *State v. Martini,* 144 N.J. 603, 677 A.2d 1106 (1996) (*"Martini III"*), the New Jersey Supreme Court agreed with the trial court that the psychiatric evidence demonstrated Martini's competence to make the waiver decision, but granted PCR review based on an independent interest of the State to ensure the fair application of the death penalty. In addition, the court in *Martini III* remanded the matter to the trial court for a PCR hearing

to review "a defense based on certain undisclosed information that has been imparted to the Public Defender and presumably was not disclosed to the jury below" and two other issues which are not pertinent to this appeal. *Martini III,* 144 N.J. at 610–11, 677 A.2d 1106.

On remand, the Public Defender attempted to present materials Martini considered confidential, claiming the information constituted mitigating evidence erroneously omitted at the penalty-phase trial. Yet Martini expressed his continued desire to keep this evidence confidential. The court conducted an *in-camera* inspection of the Public Defender's submission, and ruled that Martini's interest in maintaining the confidentiality of the submitted materials prevented their use in the PCR proceeding. The Public Defender sought and obtained leave to appeal the court's decision to the New Jersey Supreme Court. That Court vacated the trial court's order, and again remanded the matter to permit the judge to "reconsider the issue of the omission of mitigating evidence from Defendant's penalty-phase trial." *State v. Martini,* 148 N.J. 453, 690 A.2d 603 (1997) (*"Martini IV"*). The Court specifically directed the lower court to determine five issues related to the omission of this allegedly mitigating evidence, including: (1) "[w]hether the evidence was mitigating"; (2) "[i]f the evidence was mitigating, whether defense counsel's failure to obtain the evidence constituted ineffective assistance of counsel, or whether the omission of the evidence constituted a manifest injustice and a violation of defendant's constitutional rights, entitling defendant to post-conviction relief." *Id.* at 454, 690 A.2d 603.

---

2. *Martini v. New Jersey,* 516 U.S. 875, 116 S.Ct. 203, 133 L.Ed.2d 137 (1995).

On remand, the trial judge, after reviewing all of the confidential evidence, determined that the evidence was not mitigating. In rejecting Martini's claims, the trial judge refused to allow two experts to testify on the mitigation value of the evidence, because he believed that to be unnecessary. Because he found the evidence was not mitigating, the trial judge determined that counsel's failure to obtain it was not ineffective assistance of counsel. He determined that even if the evidence had some mitigating value, this value would be outweighed by Martini's confidentiality interests in the evidence. In addition, the judge found that some of the evidence was damaging to Martini, and this eliminated the possibility that its omission constituted a manifest injustice to him.

The trial judge also decided additional issues raised in the PCR petition. Two of those issues are relevant to this petition. First, the judge rejected the Public Defender's argument that the State committed a *Brady* violation by failing to disclose the confidential information to the defense before Martini's murder trial. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial judge concluded that the State did not have knowledge of the evidence at the time and, therefore, could not be obligated to release to Defendant what it did not know. Further, even if knowledge were imputed to the prosecutors, there was no *Brady* violation because Defendant himself possessed the information, yet chose not to share it with his attorneys. (10 PCR 40:8–41:5.) Second, the Public Defender also claimed ineffective assistance of counsel because of the defense counsel's failure to obtain and use two burned cocaine screens that the Public Defender argued would have strengthened Petitioner's diminished capacity defense. The judge rejected this argument determining that the evidence would not have "changed the jury's mind

as to whether or not the defendant was using or not using cocaine at the time." (10 PCR 42:3–42:9.)

On appeal, the New Jersey Supreme Court in *State v. Martini* ("*Martini V*"), 160 N.J. 248, 734 A.2d 257 (1999), considered Martini's claims for ineffective assistance of counsel and *Brady* violation. The court affirmed the trial court, and held that Martini's counsel did not render ineffective assistance of counsel because the evidence was not "mitigating," and therefore it did not meet the *Strickland* prong of "prejudice" to the defendant, such that there was a reasonable probability that the outcome of the jury's deliberations would have been different. *Id.* at 265–68, 734 A.2d 257; *see also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court further held that defense counsel's conduct was not "deficient" under *Strickland* because: (1) the counsel's failure to discover the allegedly mitigating evidence was significantly affected by Petitioner's conduct; and (2) it was reasonable for counsel "to conclude that further investigation would not yield anything useful." *Martini V* 160 N.J. at 267, 734 A.2d 257. Second, the court rejected Petitioner's *Brady* claim because the information was not mitigating. Moreover, the court found that because, as determined, Defendant knew the information, the government did not have a duty to turn over to him that which he already knew. *Id.* at 269–270, 734 A.2d 257. Finally, the court dismissed Petitioner's claim for ineffective assistance of counsel for failure to discover and present the burned screens at the guilt and penalty-phase trials. The Court concluded that the burned screens would have "added only cumulative weight" to the contention that Petitioner had used cocaine around the time of the murder. *Id.* at 272, 734 A.2d 257.

## DISCUSSION

### Standard for Review Under 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective April 24, 1996, amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. For any petitions filed after the effective date of AEDPA, courts are required to apply those amended standards. *See Werts v. Vaughn,* 228 F.3d 178, 195 (3d. Cir.2000) (citing *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Under 28 U.S.C. § 2254(a) (2001), a federal court is required to consider only petitions filed on behalf of individuals in custody pursuant to a state court judgment which are grounded on a violation of the Constitution or the laws or treaties of the United States. Moreover, the petitioner must "exhaust" all of his claims in state court before coming to federal court. *See* 28 U.S.C. § 2254(b) (2001); *Werts,* 228 F.3d at 192.

The AEDPA increased the deference federal courts must give to factual findings and legal determinations of the state courts. *See Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d. Cir.1996). Under the Supreme Court's landmark case, *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), federal habeas corpus relief is denied to any claim which was adjudicated on the merits in a state court proceeding, unless such application:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. §§ 2254(d)(1) and (2)(2001). As stated by the Court of Appeals for the Third Circuit, the federal habeas court must first determine whether the state court decision was "contrary to" Supreme Court precedent. *See Keller v. Larkins,* 251 F.3d 408, 417–418 (3d. Cir.2001). In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an unreasonable application of Supreme Court precedent. *Id.* The appropriate inquiry to be made under the "unreasonable application of" standard is "whether the state court's application of clearly established federal law was objectively unreasonable"; an incorrect application alone does not warrant relief. *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521, 146 L.Ed.2d at 428.

The second prong requires the petitioner to show that the state court decision was based on an unreasonable determination of facts in light of the evidence presented at trial or at a hearing. *Id.* at 413, 120 S.Ct. at 1523, 146 L.Ed.2d at 430. However, factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Werts v. Vaughn,* 228 F.3d at 196, *citing* 28 U.S.C. § 2254(e)(1) (1997).

### I. Ineffective Assistance of Counsel Because of Failure to Investigate and Present Allegedly Mitigating Evidence

Petitioner argues that the New Jersey Supreme Court's decision that he was provided effective assistance of counsel during his capital trial was an unreasonable application of *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d. at 694. Petitioner claims ineffective assistance of counsel because of his trial counsel's failure to conduct a timely and effective investigation

that would have uncovered certain mitigating evidence and to use this evidence at the penalty-phase of his trial.[3] After conducting an *in camera* review of the record and the evidence at issue, this Court concludes that the New Jersey Supreme Court's dismissal of Petitioner's ineffective assistance of counsel claim was a reasonable application of the law and a reasonable interpretation of the facts.

*Standard for Ineffective Assistance of Counsel*

Under *Strickland,* the United States Supreme Court held that the test for ineffective assistance of counsel is:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* The standard by which the defense counsel's actions should be measured is whether the performance was deficient as seen through "an objective standard of reasonableness" under prevailing professional norms, and whether the defendant was prejudiced. *Id.* at 687–688, 104 S.Ct at 2064, 80 L.Ed.2d. at 693. The defendant must overcome the presumption that "under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct at 2068, 80 L.Ed.2d. at 695 (citing *Michel v. Louisiana,* 350 U.S. 91, 100–101, 76 S.Ct. 158, 164, 100 L.Ed. 83.). [C]ounsel has a duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations necessary ... a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2068, 80 L.Ed.2d at 695.

To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d. at 698.

*Is the evidence mitigating?*

█ Petitioner argues that the state court's ruling that the evidence was not mitigating and not prejudicial was both based on an unreasonable determination of the facts and an unreasonable application of established federal law. He argues that determinations of fact and law made by the state courts were objectively unreasonable applications of *Strickland* and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

According to Petitioner, the evidence would have had a "profound" effect on the penalty phase of the trial. However, Defendants argue that the evidence would not have been mitigating at the penalty phase of the trial and furthermore, may have had a damaging effect because of the "double-edged" nature of the evidence. In addition, Respondents argue that the prosecu-

---

**3.** Because of confidentiality interests of Petitioner with regard to the evidence at issue in this claim, this matter and all proceedings related to it have been placed under seal.

tion would have introduced damaging rebuttal evidence that would have reduced any mitigating effect this evidence would have had. In response to this argument, Petitioner contends that the majority of the potentially damaging evidence would not have been admitted.[4] *See Martini V,* 160 N.J. at 262, 734 A.2d 257.

Petitioner further argues that the New Jersey Supreme Court's rejection of the mitigating nature of the evidence because it carries with it "substantial downside potential" is an unreasonable application of *Lockett v. Ohio* and its progeny. According to Petitioner, " '[w]hen the ultimate issue is whether to put someone to death, it is virtually impossible for a court to determine that evidence that is dual in nature is not mitigating.' " (Petitioner's Mem. at 34 (quoting Handler's dissent, *Martini V,* 160 N.J. at 287, 734 A.2d 257.)). Petitioner goes on to cite to *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), which found that a petitioner's record of accomplishment in prison was mitigating evidence that a jury should have heard despite the damaging effect of acquainting the defendant with an earlier criminal or juvenile record. (Petitioner's Mem. at 34.)

This Court disagrees with Petitioner's application of *Williams* to the case at hand. In *Williams,* counsel had failed to introduce *available* evidence contained in prison records of the defendant's "nightmarish childhood"—"that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was 'borderline mentally retarded,' had suffered repeated head injuries and might have mental impairments

organic in origin." *Id.* at 370, 120 S.Ct. at 1502, 146 L.Ed.2d at 404. Furthermore, counsel failed to produce evidence of his good conduct as a prisoner and testimony that indicated the defendant's lack of future dangerousness. Instead, at the sentencing-phase, the trial counsel focused on the defendant's voluntary confession and produced testimony of three witnesses briefly describing the defendant as "a 'nice boy' and a non-violent person." *Id.* at 369, 120 S.Ct. at 1500, 146 L.Ed.2d at 403. The juvenile records that provided this mitigating evidence may have "revealed that [the defendant] had been thrice committed to the juvenile system—for aiding and abetting larceny when he was 11 years old, for pulling a false fire alarm when he was 12, and for breaking and entering when he was 15 . . . ."; however, it is quite apparent that as a whole that evidence was mitigating. *Id.* at 396, 120 S.Ct. at 1514, 146 L.Ed.2d at 420. Here, the mitigating value of the evidence cannot be compared to the value of the omitted evidence in *Williams.* The potentially damaging effect of the evidence here outweighs that in *Williams.* In *Williams,* the omitted evidence was "readily available" to defense counsel; it was their own lack of competence that prevented them from having access to this evidence.[5]

This Court is convinced that any mitigating value of the materials is sufficiently outweighed by the potentially damaging effect that this evidence could have had for Petitioner at the penalty-phase trial. Even considering the fact that the trial judge found some of the evidence inadmissable as rebuttal evidence, there re-

---

4. In his decision during the PCR hearing, the trial judge determined that some of the damaging evidence "[could not] be used because that would be getting an aggravating factor in through the back door which you couldn't get in through the front door."

5. The fact that the mitigating evidence was not "readily available" to the defense counsel will be discussed in the following section of this opinion.

mains a significant amount of damaging evidence that the state could have produced in rebuttal. This Court concludes that overall this evidence would not be mitigating and contrariwise, would be potentially damaging to Martini. This Court finds that the New Jersey Supreme Court's determination that the evidence was not mitigating and the omission of this material not prejudicial to have been reasonable.

*Was the defense counsel's performance deficient?*

 Petitioner contends that by failing to investigate and present the allegedly mitigating evidence, the defense counsel did not fulfill their obligation to conduct a "reasonable investigation" under *Strickland.* According to Petitioner, Defendant may have "deflected questions" from his trial attorneys, but he did not "purposely hid[e] information from his attorney," as described by the New Jersey Supreme Court. *Martini V,* 160 N.J. at 266, 734 A.2d 257. Petitioner further argues that there is no such thing as a "legitimate strategic reason" for choosing ignorance over knowledge. "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed,* 894 F.2d 871, 878 (7th Cir.1990).

 "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not be later challenged as unreasonable." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 696. "[C]ounsel has a duty to make reasonable investigations" but the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."

*Id.,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d at 695–96.

Here, defense counsel's decision not to investigate was reasonable because it was based on Defendant's refusal to reveal this information to his attorneys. Petitioner remained silent about the allegedly mitigating evidence although he was very well aware of its existence. When counsel attempted to ask Petitioner questions regarding the subject matter of the evidence, Petitioner responded, "it had no bearing on the case." After this response by Petitioner, counsel made the informed, reasonable decision to cut off further investigation because Defendant had given counsel reason to believe that pursuing the investigation would be fruitless. *See Riley v. Taylor,* 277 F.3d 261, 305–06 (3rd Cir. 2001) (finding that counsel was not ineffective because of failure to present mental expert testimony when, in light of conversations with the defendant, counsel had no reason to think that a mental examination would be useful.). This Court finds that the state court's determination that "it was reasonable for his attorneys to conclude that further investigation would not yield anything useful" was a reasonable application of clearly established federal law and a reasonable interpretation of the facts. *Martini V* at 267.

*Conclusion*

This Court denies Petitioner's motion based on ineffective assistance of counsel for failure to investigate and present certain mitigating evidence. The New Jersey Supreme Court's holding was a reasonable application of the law and interpretation of the facts for the following reasons: (1) the evidence itself is not mitigating because its potential to be damaging to Petitioner outweighs the limiting mitigating value it may have had; (2) any possible mitigating value is further outweighed by the potentially damaging value of the Government's re-

buttal evidence; and (3) it was reasonable for Petitioner's trial counsel not to conduct any further investigation because he not only deliberately withheld this information from his attorneys but also deflected questions regarding the information.

As a result, the first prong of *Strickland* has not been satisfied because the lawyer's performance was not "deficient". Second, the "prejudice" prong has not been met because even if the evidence had been presented to the jury, there is not a reasonable probability that the outcome would have been different.

## II. Ineffective Assistance of Counsel Because of Failure to Find and Use Drug Paraphernalia

■ Petitioner's second ground for a writ of habeas corpus is that his trial attorney rendered ineffective assistance of counsel by failing to adequately inspect the state's evidence to find and use drug paraphernalia in the form of several burned cocaine screens in Martini's defense during the guilt and penalty-phase trials. Petitioner argues that the state supreme court's rejection of this issue was an "unreasonable application" of *Strickland* and an unreasonable interpretation of the facts.

The burned cocaine screens at issue were found in Martini's and Afdahl's apartment and then placed in the State's physical evidence file. Although Martini's attorneys presented other drug paraphernalia at trial, they overlooked the burned screens and failed to present them.

The New Jersey Supreme Court concluded that counsel's failure to find the screens was inadvertent, *Martini V*, 160 N.J. at 272, 734 A.2d 257, but, that, in any event, Martini himself had presumably known of their existence although he never mentioned them. *Id.* The Court then analyzed whether the production of this additional evidence would have been likely to have had a substantial effect on the jury's deliberations. The Court reasoned:

> Given counsel's presentation of other drug paraphernalia, including a glass cocaine pipe and a glass vial, and a certified laboratory report indicating that both the pipe and the vial contained trace elements of cocaine, the burned screens would have added only cumulative weight to the argument that Martini had used cocaine around the time of the murder.

*Id.*

Petitioner argues that the five scorched cocaine screens which the trial counsel failed to find, could have led to a different guilt or penalty phase result. According to Petitioner, the screens would have corroborated Petitioner's diminished capacity defense and rebutted any doubts raised by the prosecutor over whether Petitioner used cocaine around the time of the Flax murder. In oral argument, Petitioner further argued that the screens would have added to evidence of "immediacy" of the cocaine use of Petitioner before the time of the Flax murder. Furthermore, the screens would have supported three mitigating factors at the penalty phase.[6]

---

6. The defense asserts that the evidence would have supported the following three mitigating factors: (1) *N.J.S.A.* 2C:11–3c(5)(a) which states, "The defendant was under the influence of extreme or emotional disturbance insufficient to constitute a defense to prosecution"; (2) *N.J.S.A* 2C:11–3c(5)(d) which states, "The defendant's capacity to appreci- ate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution"; and (3) *N.J.S.A.* 2C:11–3c(5)(h), the so-called "catch-all" factor.

In addition, Petitioner argues that there is no reason that his attorneys should not have inspected the brown bag closely as Afdahl's attorneys did on her behalf. According to Petitioner, "[t]here can be few failures so basic as failing to fully examine the physical evidence. In a capital case, such a want of care is indefensible." (Petitioner's Mem. at 71.)

According to Respondents, the screens would have added at best cumulative weight to the other evidence of Petitioner's drug use that was presented at trial. Petitioner's counsel not only used a vial and a pipe seized from Martini's apartment that tested positive for cocaine to demonstrate his cocaine use but also used Martini's confession, his hospital records, the scars on his arm from drug usage, and his wife's testimony. Also, Petitioner's counsel used the expert testimony of a psychiatrist and a psychologist, as well as testimony from a psychiatric social worker to establish the effect of cocaine on his mental state and culpability.

Petitioner's counsel examined the physical evidence, including the other items of drug paraphernalia. However, the thumbnail sized screens were in the bottom of a bag, wrapped in masking tape; the tiny taped bundle looked like "a little bit of garbage" according to Afdahl's attorney. Martini himself was aware of the drug paraphernalia that would have been in his apartment.

Respondents further argue that Martini was not prejudiced by the omission of the screens from the trial and/or the penalty phase because: (a) "[t]he screens may never have been tested by the police lab, insofar as they were submitted to the lab along with the pipe, and the lab report indicated that only one item was tested"; (b) "[t]he screens, even if they tested positive for cocaine, do not prove *Martini* used cocaine"; (c) nor do "[t]he screens, even if

positive for cocaine, [indicate] *when* the cocaine was burned"; and (d) "[t]he defense case was replete with expert testimony, lay testimony, medical reports, Martini's confession, and a positive lab report indicating that cocaine was detected on the paraphernalia found in Martini's apartment." (Respondent's Mem. at 17.)

In denying post-conviction relief, the trial court judge concluded:

There was so much evidence heard by this Court and by the jury that I'm firmly convinced that the failure to find those screens would not have changed the jury's mind as to whether or not the defendant was using or not using the cocaine at the time.

This Court agrees with the New Jersey Supreme Court that the burned cocaine screens was at best cumulative evidence of Petitioner's cocaine use around the time of the murder. Not only was other drug paraphernalia that tested positive for cocaine used but also Martini's confession, his hospital records, the scars on his arm from drug usage, his wife's testimony, expert testimony of a psychiatrist, a psychologist, and a psychiatric social worker were used to establish his drug use or the effect of cocaine on his mental state and culpability. Nor do the burned screens prove that Petitioner himself used cocaine or the time the cocaine was used. Consequently, this additional evidence would not have substantially affected the jury's deliberations—the prejudicial prong would not be satisfied under *Strickland*. It is also apparent that the omission of the thumbnail-sized burned screens was inadvertent and a reasonable oversight by Petitioner's counsel. Counsel's representation was not "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

Because the state supreme court's determination of the facts and application of

clearly established federal law was reasonable, this Court denies relief on this ground.

### III. Violation of Petitioner's Due Process Rights Because of Prosecution's Failure to Turn Over Allegedly Mitigating Evidence to the Defense as required by Brady v. Maryland

■ Petitioner argues that the New Jersey Supreme Court's conclusion that certain evidence was not "material" for purposes of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), was contrary to and an unreasonable application of *Brady* and its progeny. This Court rejected this argument in its February 9, 2001 Opinion denying Petitioner's motion for evidentiary hearing and discovery. After reconsideration, this Court maintains the position expressed in that opinion.

The New Jersey Supreme Court correctly applied the following standard for materiality: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is one that is 'sufficient to undermine confidence in the outcome.'" *U.S. v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (citation omitted).

The New Jersey Supreme Court argued that it was not reasonably probable that disclosure of the omitted evidence would result in a different outcome because "although the evidence has some mitigating value, it poses a 'clear risk of an adverse jury reaction'" *Martini V*, 160 N.J. at 269, 734 A.2d 257 (quoting *Marshall III*, 148 N.J. at 258, 690 A.2d 1). As discussed previously with regard to the ineffective assistance of counsel claim, the court found

that not only does this material itself have potential to adversely affect a jury but also the presentation of such evidence would give the prosecution the opportunity to present potentially damaging rebuttal evidence.

*Brady v. Maryland* held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–7, 10 L.Ed.2d at 218. As the Court of Appeals for the Third Circuit summarized:

> Brady thus requires disclosure by the government of evidence that is both exculpatory and material. Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence. If the exculpatory evidence 'creates a reasonable doubt' as to the defendant's culpability, it will be held to be material.

(citations omitted) *U.S. v. Starusko*, 729 F.2d 256, 260 (3d Cir.1984).

Petitioner argues that it is unjust to hold that a *Brady* claim is defeated by the bare fact that a defendant has knowledge of potential *Brady* material. If extenuating circumstances prevent full disclosure to his trial attorneys, it is unjust to deprive a defendant of the *Brady* remedy. *See Nagell v. U.S.*, 354 F.2d 441 (5th Cir.1966). Petitioner says that the circumstances sur-

rounding the materials [7] constituted the extenuating circumstances that prevented him from disclosing the evidence to his trial attorneys.

In *Government of the Virgin Islands v. Martinez* ("*Martinez II*"), 831 F.2d 46 (3d. Cir.1987), the Court of Appeals for the Third Circuit reviewed the district court's refusal to give the defendant a *Brady* remedy when the evidence of a defendant's confession to a detective describing the commission of the crime as an act of self-defense had not been turned over to the defendant's counsel. The defendant had not told his counsel of this statement because "he was incapacitated by family pressure from communicating truthfully with his attorney concerning the fact that he had killed [the victim]." *Id.* at 48. The Court affirmed the district court's rejection of the defendant's argument, finding that this situation was not as compelling as the situation in *Nagell*,[8] where the defendant had a mental defect that prevented him from communicating truthfully with his attorney. Rather, the Court argued that any *Brady* violation by the prosecution was avoided or cured by the defendant's willful failure to disclose the statement to his trial attorney. The Court reasoned that "the cause of [the defendant's counsel's] inability to do so was her client, not the government." *Id.* at 50; *see also, U.S. v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984) ("because the defendant suffered no prejudice from the government's failure to disclose ..., there was no *Brady* violation").

This Court finds that the case at hand is more like *Martinez II* than *Nagell.* It is

disputed whether the state prosecutors actually knew or should have known of the evidence. Nevertheless, as reasoned in *Martinez II,* this Court finds that any *Brady* violation allegedly committed by the prosecutor is cured by the undisputed fact that Petitioner willfully withheld this information from his counsel.

■ Accordingly, this Court finds that the New Jersey Supreme Court's holding was a reasonable application of *Brady.* The evidence at issue was not material because it is not reasonably probable that disclosure of the omitted evidence would have resulted in a different outcome. Although the material contains some mitigating evidence, it also contains damaging evidence that poses a "clear risk of an adverse jury reaction." *Martini V,* 160 N.J. at 269, 734 A.2d 257 (quoting *State v. Marshall,* 148 N.J. 89, 258, 690 A.2d 1 (1997) ("*Marshall III*").). Presentation of such material would give the prosecution the opportunity to introduce damaging rebuttal evidence. And, even if the evidence is mitigating, any *Brady* violation committed by the prosecution is cured because Petitioner knew of it and willfully withheld it from his lawyer.

## IV. Violation of Due Process Rights Because of Exclusion of Potential Jurors Based on their Death Penalty Reservations

Petitioner argues that the trial court's improper excusal of prospective jurors, Timothy Wedeen, Ronald Vladyka, and Florence Zappala denied him his rights to due process of law and an impartial jury in

---

7. The exact nature of which this Court does not reveal here because the materials are under seal.

8. In *Nagell,* the Court of Appeals for the Fifth Circuit reversed the district court's denial of a new trial on the grounds that the prosecution had failed to turn over evidence that indicated

a medical expert's inability to say that the defendant "was reasonably able ... to factually confer with his attorney or to raise a defense." 352 F.2d at 447. This evidence was known to the defendant but not known to his counsel until after he had been convicted for an abortive attempt to rob a bank.

violation of the 6th and 14th Amendments. According to Petitioner, the New Jersey Supreme Court's determination that this decision was within the trial court's discretion was an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. After a close review of the trial court record, this Court finds that the New Jersey Supreme Court was reasonable in its application of law and interpretation of facts and denies relief on this ground.

### Adams/Witt Standard

■ The standard of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and clarified in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), provides that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams,* 448 U.S. at 45, 100 S.Ct. at 2526, 65 L.Ed.2d at 589. Deference will be paid to a trial court's discretionary determination because the inquiry turns in large part on an assessment of credibility and demeanor. *U.S. v. Barnette,* 211 F.3d 803, 812 (4th Cir.2000). The United States Supreme Court in *Witt* noted:

> this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the matter of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked

enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law .... [t]his is why deference must be paid to the trial judge who sees and hears the juror.

*Witt,* 469 U.S. at 424–426, 105 S.Ct. at 852–853, 83 L.Ed.2d at 852–853. The *Witt* Court held that a trial judge's determination to excuse a prospective capital sentencing juror for cause is a finding of fact subject to a presumption of correctness under 28 U.S.C. § 2254(d).[9] *Id.* at 429, 105 S.Ct. at 855, 83 L.Ed.2d at 855. With regard to the standard of review under the habeas statute, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Id.* at 434, 105 S.Ct. at 858, 83 L.Ed.2d.at 857.

### Timothy Wedeen

■ Mr. Wedeen was excused *sua sponte* by the trial judge over the objection of defense counsel. It is obvious from the record that Mr. Wedeen expressed significant doubts about his ability to impose the death penalty.

As can be seen from the exchange below, Timothy Wedeen initially told the judge during voir dire that he did not agree with the death penalty, thought it

---

9. Since *Witt,* the statute has been amended and now, the applicable section of the habeas statute is codified under 28 U.S.C. § 2254(e)(1). This amended version additionally provides that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"barbaric" and expressed doubt that he could impose the death penalty.

Q. What are your feelings about the death penalty?

A. I don't agree with it. Capital punishment is barbaric.

Q. Are there any crimes that you think it is appropriate to impose the death penalty?

A. No, I do not.

Q. None at all?

A. Not really no. I feel life without parole is a more appropriate measure.

\* \* \* \* \* \*

Q. And once having taken such an oath, if the facts warrant it and the principles warrant it, those combined, they warranted the imposition of the death penalty, would you be able to impose the death penalty?

A. I would find it difficult. My judgment would be affected by my personal feelings. I could not say that it wouldn't.

Q. Would you be able to find it in the appropriate case?

A. Would I be able to sentence someone to die?

Q. Yes, in the appropriate case.

A. I honestly can't say. I really don't know. I feel very strongly about this.

(3T 167–1 to 167–10; 167–17 to 168–6.)

In answer to the defense counsel's question as to whether he would follow the law, he did say, "[y]es, I will follow it." (3T 169–2 to 169–4) However, in response to a question by the prosecutor, he then stated again that he did not know if he could make a decision based on the facts putting aside his personal feelings.

Q. Would you be able to make that decision based on the facts in the case putting aside your personal feelings?

A. I don't know. I honestly do not know. I feel very strongly about this issue.

(3T 171–3 to 171–7.)

Again, to another inquiry by defense counsel asking whether he could "follow the law as the Judge gives it to [him]?", Mr. Wedeen answered "[y]es, I will." (3T 171–18 to 171–19.)

Finally, upon questioning by the trial judge, Mr. Wedeen expressed definite hesitance in his ability to impose the death penalty, absent his feelings:

Q. Would your views prevent you or impair your ability to impose the death penalty?

A. They may. I honestly have to say they may. It's something I feel very strongly about. I have very strong convictions about this.

Q. That's what we want from you. No one is trying to put you on the spot. We're just trying to find out your honest views so that we have a jury who will listen to the evidence and make the decision based on the evidence and the proofs posed. I know it's difficult when you have strong feelings one way or another about a certain issue.

A. My judgment would be impaired by my feelings, yes. I have to be honest and say yes, it would when it comes to that issue. I wish I could say otherwise but that's how I feel.

(3T 172–8 to 172–23.)

The trial judge excused Mr. Wedeen over the defense counsel's objections stating, "[i]f he is not telling us that his ability to impose the death penalty may be impaired by his beliefs, he's at least telling us, 'I don't know.'" (3T 177–1 to 177–3.)

Petitioner says that Wedeen's excusal was inappropriate: First, the court excused him on its own motion over the objection by defense counsel. The prosecutor never asked that Wedeen be excused. Second, the trial court's use of the phrases "would impair" and "may impair" indicated that the trial judge was using a standard more exacting than federal law. Petitioner further claims that Wedeen's voir dire did not meet the *Adams/Witt* standard because Wedeen drew the distinction between following the law but could not guarantee his beliefs not surfacing during deliberations.

As shown by the above exchanges, Mr. Wedeen indicated that his views towards the death penalty would substantially affect his penalty-phase deliberations by stating that his "judgement would be impaired by [his] feelings." The *Witt* Court sustained the dismissal of a juror that answered, "I am afraid I would" and "I think I would" when asked whether her beliefs against the death penalty would interfere with her sitting as a juror in a capital case. *Witt*, 469 U.S. at 416, 105 S.Ct. at 848, 83 L.Ed.2d at 846; *see also Riley*, 277 F.3d 261, 307–09. Here, Mr. Wedeen has answered with at least as much hesitance in his ability to impose the death penalty as the juror in *Witt*.

This Court finds that Petitioner has not overcome the presumption of correctness that is accorded to the trial judge. *See Witt*, 469 U.S. at 424–426, 105 S.Ct. at 852–853, 83 L.Ed.2d at 852–853. And, this Court concludes that the state supreme court's determination that "his excusal for cause was well within the trial court's discretion" was factually supported by the record and was a reasonable application of federal constitutional jurisprudence. *Martini I*, 131 N.J. at 219, 619 A.2d 1208.

*Ronald Vladyka*

■ Mr. Vladyka was dismissed for cause *sua sponte* by the trial judge over

defense counsel's objection because of his inability "to fulfill his duty and function as a juror." (27T 28–21 to 28–22.) The record demonstrates that Mr. Vladkya would not have been able to announce a sentence of death and had significant doubts about his ability to weigh the mitigating and aggravating factors before reaching a decision on the sentence.

Mr. Vladkya initially expressed doubts about his ability to impose the death penalty for any crime.

Q. Do you have any feelings or beliefs about the death penalty?

A. I don't believe in it.

Q. Under any circumstances?

A. Well, I just—I don't know. I just don't believe in it. I can't really give a reason why.

Q. Do you think there are any crimes where the death penalty is an appropriate penalty?

A. Well—no.

Q. None at all?

A. No, not really.

(27T 18–18 to 19–3.)

Furthermore, Mr. Vladyka expressed ambivalence about his ability to weigh the aggravating and mitigating factors and if the facts warranted, impose the death penalty.

Q. As a sworn juror if the jury were to find the defendant guilty of murder, he would be hearing evidence from the State we call aggravating factors; the defense would be presenting mitigating factors. I would explain the principles of law that you're to apply. As a sworn juror, would you be able to weigh those factors, the evidence on both sides, apply the principles of law as I explain, and if the facts warranted, this is hypothetical, if the facts war-

ranted, would you be able to vote to impose the death penalty?

A. That's a hard situation. You know, you don't know the facts, okay.

(27T 19–13 to 19–23.)

This Court acknowledges that Mr. Vladyka did answer "yes" to the question, "Would you be able to vote to impose the death penalty?" (27T 20–5 to 20–6.) However, later, Mr. Vladyka again expressed ambivalence about his ability to weigh the factors and to sentence a petitioner to death if the circumstances warranted.

Q. Can you do both, having made the weighing process of aggravating and mitigating factors, are you capable in the proper circumstances to send John to death row?

A. I guess if everything was in place and I believed in it, I mean, you know it is hard to say yes or no.

(27T 26–1 to 26–5.)

Finally, the trial judge excused Vladyka when he answered "no" to the question whether he, if chosen as a foreperson, would be able to announce a verdict in favor of the death penalty (a question to which he had answered "I don't know" earlier). The defense counsel objected arguing that Mr. Vladyka was "railroaded." He argued that Mr. Vladyka would not have to be the person to announce that a man would die. Further, he claimed that Mr. Vladyka "was unfairly treated" and "was rushed." (27T 28–10 to 28–17.) In response, the trial judge stated that he did not feel that "[Vladyka] would be able to fulfill his duty and function as a juror." (27T 28–21 to 28–22.)

Petitioner contends that the New Jersey Supreme Court's affirmance of the trial court judge's excusal of this prospective juror was an unreasonable application of the law because he answered "yes" when asked if he would be able to impose the death penalty. The New Jersey Supreme Court also recognized that he indicated "with significant reluctance" that he "could follow his oath as a juror and vote for the death sentence." *Martini I,* 131 N.J. at 219, 619 A.2d 1208.

Petitioner further contends that Mr. Vladyka's inability to announce the sentence of death should not have prevented him from being on the jury because someone else on the jury could be assigned to be foreperson. However, Petitioner fails to view the questioning "as a whole." *Witt,* 469 U.S. at 435, 105 S.Ct. at 858, 83 L.Ed.2d at 858. First of all, Mr. Vladyka's inability to announce the sentence of death gives some indication of "an unwillingness or an inability on the part of [the juror] to follow the court's instructions and obey [his] oath, regardless of [his] feelings about the death penalty." *Adams,* 448 U.S. at 50, 100 S.Ct. at 2529, 65 L.Ed.2d at 593. This alone may not constitute excusal of a juror. However, this fact in combination with Vladyka's announcement that he did not believe in the death penalty, that there were no crimes for which he thought it would be an appropriate punishment, and his ambivalence about his ability to weigh aggravating and mitigating factors to determine whether to impose the death sentence all contributed to the trial judge's decision to excuse him.

A juror's bias does not have to be made " 'unmistakably clear.' " *Witt,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 852. Rather, the trial judge's determination of juror bias "involves credibility findings whose basis cannot be easily determined from an appellate record." *Id.* at 429, 105 S.Ct at 855, 83 L.Ed.2d at 855.

The Petitioner has not overcome the presumption of correctness accorded the trial judge's decision. The New Jersey Supreme Court's determination that Vladyka's excusal was within the trial judge's discretion was based on a reasonable de-

termination of the facts supported by the record and not contrary to, or an unreasonable application of, clearly established federal law.

### Florence Zappala

■ The trial judge excused Ms. Zappala upon a motion by the prosecution to "thank and excuse" her because of her inclination to "give a little more weight to that testimony of a police officer only because it [sic] was a police officer." (31T 22–10 to 22–11.) Defense counsel objected to the prosecution's motion on the basis that "with the assistance of counsel, properly done, we could have salvaged her ... and she would have been admitted into the pool." (31T 22–18 to 22–19.)

From the following, the trial judge was justified in his impression that Ms. Zappala would be inclined to give more weight to the testimony of police officers.

> Q. You were asked if you would believe the testimony of a police officer just because the party testifying was a police officer, and you said yes. Why is that?
>
> A. I think I would. I mean, I would be inclined to.
>
> * * * * * *
>
> Q. You can't have jurors who come in and say, 'Well, anything a police officer tells me I'm going to believe.' We want jurors who will listen to the evidence and fairly evaluate the evidence?
>
> A. Balance.
>
> Q. Now, based on your answer to that question, we don't know if you can do that. Only you can tell us.
>
> A. I don't know. I mean, it would be a question I would think about, I'd be inclined to believe a police officer, but I don't know. You know, I

should think he'd be telling the truth.

(31T 20–2 to 20–21.)

Petitioner objects to the treatment of prospective-juror Florence Zappala because she was cut-off mid-answer by the prosecutor's motion to excuse the juror and was prevented from completing an answer to the question that would have indicated whether she would have been qualified to sit. The trial judge explained that he based this excusal upon his perception that the juror would give more weight to the testimony of police officers. Petitioner argues that the court should have undertaken further questioning of the juror with that end in mind especially since defense counsel did not object to the juror.

This Court finds Petitioner's arguments weak. Mrs. Zappala was excused because of her bias towards the testimony of police officers. That she was unable to finish an answer in response to a question regarding her beliefs on the death penalty is irrelevant to her feelings about the testimony of police officers. This Court finds that the questioning with regard to her treatment of testimony of police officers was sufficient. The New Jersey Supreme Court's analysis that the trial court was within its discretion "in excusing Mrs. Zappala based on her remarks concerning the veracity of police officers" was a reasonable interpretation of the facts and a reasonable application of clearly established federal law. *Martini I*, 131 N.J. at 221, 619 A.2d 1208.

### V. Trial Court's Refusal to Instruct the Jury on "Substantial Assistance"

■ Petitioner asserts that the New Jersey Supreme Courts' holding that the trial judge's refusal to instruct the jury that Petitioner rendered substantial assistance to the state in the prosecution of another person for the crime of murder, did not prevent the jury from considering

and giving effect to mitigating evidence was objectively unreasonable within the meaning of 28 U.S.C. § 2254. This Court finds that Petitioner's argument has little merit and denies relief on this ground.

The New Jersey Supreme Court found that there was not sufficient reliable evidence of the substantial assistance instruction, N.J.S.A. 2C:11–3C(5)(g) ("factor 5(g)"), to submit to the jury and even if there had been, the failure to submit it was harmless error.

The evidence of substantial assistance presented to the jury during the penalty-phase of the trial was the testimony of FBI Agent Trahey who related that Petitioner told Afdahl that he was going to cooperate with the investigators and tell them "what had happened and that he wanted her to be aware of that fact." This conversation lasted "[a]t best two to three minutes." It was undisputed that Afdahl made an inculpatory statement after speaking to Petitioner.

At the pretrial hearing on Petitioner's motion to suppress, further testimony about Petitioner's meetings with Afdahl on January 26th and 30th was heard. According to the testimony of Agent Peterson during a pre-trial hearing, Petitioner told Agents Trahey and Peterson that Petitioner wanted to first consult with Afdahl because "he wanted to alert her to tell the whole truth as well. . . ." However, Agent Peterson, unlike Agent Trahey, does not remember hearing the conversation between Petitioner and Afdahl. Agent Trahey also testified that Martini told Afdahl, " 'Therese, I'm now going to cooperate with them and I'm going to tell them what happened.' " Furthermore, from testimony of Officer Carlino, the policeman, who questioned Afdahl, Afdahl signed consents to search the apartment and the rooms at the Days Inn before speaking to Martini. After speaking to him, "she said that she could now tell us the truth regarding Mr.

Flax's murder, because Martini had told her to cooperate with the police," so said Carlino.

However, also from pre-trial hearing testimony by Officer Carlino, Afdahl was brought back to the Prosecutor's office on January 30, 1989. After a meeting between Afdahl and Petitioner, Afdahl falsely confessed to having shot Irving Flax. Carlino said that Afdahl was asked to falsely confess by Martini in exchange for promises that they would get married and live in a cottage furnished by the Witness Protection Program.

At the commencement of the penalty phase, Petitioner asked that the jury be instructed on N.J.S.A. 2C:11–3c(5)(g), that Petitioner rendered substantial assistance to the state in the prosecution of another person for the crime of murder. The trial judge denied this request, stating:

> Substantial assistance means considerable assistance, assistance which played a fairly large or important role in the arrest or prosecution of the other person. And that has not happened here.

> Mr. Martini's short two or three minute discussion or statement to Therese Afdahl at approximately one a.m. January 26, might have lead [sic] Therese to then voluntarily give a statement as to her involvement in this, but certainly that in and of itself is not substantial assistance, meaning that it was considerable assistance, assistance which played a fairly large or important role in the arrest and prosecution of Therese Afdahl.

> Defense may be able to utilize that testimony on the catch-all mitigating factor and argue that, but as a separate mitigating factor I'm going to sustain the objection of the prosecutor.

The trial judge further stated that he would reconsider if defense presented new

evidence "that changes [his] mind on that, of course then we can always deal with that." (52 T 12–13 to 13–16.) Defense counsel did not pursue this subject any further during his penalty phase case or summation, although he did stress the extent of Petitioner's cooperation with law enforcement as a non-statutory mitigating factor. (54T 31–20 to 32–12.)

Petitioner correctly refers to the standard of review in *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998): " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' " *Id.* (*quoting Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329 (1990)).

According to Petitioner, the need for reliability in sentencing determinations between life and death is so great that the United States Supreme Court has said that "[s]o long as the evidence [introduced at a capital sentencing hearing] ... do not prejudice a defendant, it is preferable not to impose restrictions." *Zant v. Stephens*, 462 U.S. 862, 886, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235, 254 (1983) (quoting *Gregg v. Georgia*, 428 U.S. 153, 203–4, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859, 891 (1976)). Since the decision in *Lockett*, the Supreme Court has repeatedly restated that the 8th Amendment forbids a state from limiting a defendant's presentation of mitigating factors to a jury, or the jury's right to consider and independently weigh those factors. 438 U.S. at 604, 98 S.Ct. at 2964–5, 57 L.Ed.2d. at 990; *see also Eddings v. Oklahoma*, 455 U.S. 104, 113–115, 102 S.Ct. 869, 876–877, 71 L.Ed.2d 1, 10–11 (1982). The trial judge's allowance of the evidence being introduced as a "catch-all" mitigating factor or his allegations to consider new evidence "that changes his mind" was insufficient, according to Petitioner.

In addition, Petitioner finds problematic the fact that the trial judge ruled *before* the penalty phase began that the evidence was not good enough to convince him that the jury should even be allowed to consider whether the mitigating factor existed and what weight, if any, should be accorded. Petitioner contends that such a premature and exclusionary rule was inappropriate. The state supreme court also found this decision to be premature arguing that the trial judge should have waited until the end of the penalty phase when all of the evidence was before the jury with respect to the mitigating factors.

Respondents emphasize that Martini's trial attorneys chose not to present other evidence that Martini had induced his co-defendant (Therese Afdahl) to confess, despite the fact that the trial court invited them to do so. Citing N.J.S.A. 2C:11–3c(2)(a), the New Jersey Supreme Court argued that, "[a] defendant has the burden to produce evidence of existence of any mitigating factor." *Martini I* at 295, 131 N.J. 176. The record contains no indication that Martini encouraged Afdahl to confess, beyond informing her that he intended to do so. Moreover, the State was prepared to introduce rebuttal evidence that Martini tried to have Afdahl lie for him by falsely admitting that she shot the victim, so that Martini would be exonerated. Respondents and the state supreme court argue that because of this incredibly damaging evidence, "defense counsel's failure to [present evidence other than Agent Trahey's trial testimony] was understandable." *Id.*

It is noted that the trial court assured the defense that, depending on what was introduced, the court would charge the jury on the "catch-all" mitigating factor *and* re-consider its ruling on the "substantial assistance" factor if the evidence supported it. On appeal, the New Jersey

Supreme Court appropriately ruled that "the catch-all factor, c(5)(h), permitted defendant to introduce evidence of his cooperation with police that was short of 'substantial' assistance" and that the trial court had not "preclud[ed] defendant from submitting any evidence on that issue." *Id.* at 300, 619 A.2d 1208.

Even assuming it was erroneous for the trial court to reject the substantial assistance instruction, this error was harmless because the catch-all factor, c(5)(h), permitted Petitioner to introduce evidence of his cooperation with police. It is undisputed that under *Lockett*, federal law requires that the jurors not be precluded from considering as a mitigating factor any aspect of a defendant's character, record or crime. 438 U.S. at 604, 98 S.Ct. at 2964–5, 57 L.Ed.2d. at 990. However, here, the jury was not precluded from considering the evidence as a mitigating factor. Rather, the particular instruction on substantial assistance was not given because Petitioner failed to proffer particular evidence for the instruction. No instruction is needed or given when evidence is absent to support the instruction.

This Court holds that the New Jersey Supreme Court's decision was a reasonable determination of the facts in light of the evidence and a reasonable application of the clearly established federal law on this point.

### VI—Trial Court's "Erroneous" Answer to the Jury's Question Regarding Mitigating Evidence

To a written question asked by the jury during its deliberations in the penalty phase and over Defendant's objection, the trial judge instructed the jury that the testimony of Petitioner's expert witnesses could only be used to establish mitigating factors because "that's what they were presented for." Petitioner claims that this answer limited the jury's ability to use this mitigating evidence when determining if an aggravating factor existed. Accordingly, Petitioner contends that the New Jersey Supreme Court's dismissal of the trial court's erroneous answer to the jury's question regarding mitigating evidence constituted an unreasonable application of the clearly established federal law under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and further discussed in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 876–877, 71 L.Ed.2d 1, 10–11 (1982), *Penry v. Lynaugh* ("*Penry I*"), 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and *Penry v. Johnson* ("*Penry II*"), 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). He further argues that his right to a reasonable determination of sentence under the Fourteenth Amendment of the United States Constitution was violated.

The Supreme Court of New Jersey held that the response of the judge to the jury's question was at best "ambiguous," that it "may have caused prejudice" and that it "could have been understood by the jurors to limit their ability to use defendant's mitigating evidence when determining if the alleged aggravating factors existed." *Martini I*, 131 N.J. at 315–316, 619 A.2d 1208. Ultimately, the Court dismissed the error as "harmless" considering "all of the trial court's penalty-phase instructions." *Id.* at 316, 619 A.2d 1208.

After deliberating for about an hour and a half after receipt of the Court's charge, the jury submitted to the judge the following questions: "(A) Are the expert witnesses' written reports available or (B) are we only to consider their testimony for mitigating factors?" Defense counsel raised the issue: "But if they're asking if it can only be interpreted for mitigating factors maybe they're still trying to determine if there's an existence of an aggravating factor and they're looking to weigh

the testimony in opposition of an aggravating factor instead of in favor of [a mitigating] factor." In answer to the defense counsel's objection, the trial judge said: "I can't speculate as to what they might have in mind. All I can do is answer the questions they pose to us." After further elaboration by defense counsel of his objection, the judge responded: "you're reading more into it than the question itself asks. They want to know are they totally to use the testimony for mitigating factors, and I'm going to answer the question they've asked." The judge's answer to the second part of the question was:

> They were presented as far as Ms. Aviv, Dr. Musikoff, their testimony was presented to establish mitigating factors. You can utilize also Dr. Greenfield's testimony if you see that supporting any mitigating factor. That's what they were presented for and that's how you're to consider their testimony for those purposes.

During the penalty phase, the State sought to establish two aggravating factors: murder for the purpose of escaping detection, and murder in the course of kidnapping. Petitioner relied on expert testimony at both phases of the trial to rebut the prosecutor's allegation of calculated planning by showing that because of drug addiction both his thoughts and his actions were too random and chaotic to allow proof of the aggravating factors beyond a reasonable doubt.

Dr. Harvey Musikoff, a psychologist, diagnosed Petitioner as a "self-defeating" personality type with "serious feelings of unworthiness and inadequacy that permeate his life." Dr. Daniel Greenfield, a psychiatrist, testified during the guilt phase of the trial that Petitioner rated very high on a scale for schizophrenia and that he has a "very, very disorganized" and "chaotic" personality. Greenfield testified that Petitioner was unquestionably under the influence of cocaine at the time of the shooting and that he was laboring under "cognitive dysfunction", forgetfulness, an inability to concentrate and was "experiencing some acute degree of delirium." Greenfield concluded that it was impossible to determine whether Petitioner had acted purposefully or knowingly during the shooting. Diana Aviv testified that Petitioner's involvement with Afdahl led to his own drug addiction and seriously impaired his judgement and his behavior.

Petitioner contends that defense counsel drew on the above-described mitigating evidence and asked the jury to consider whether there was enough evidence for the State to prove beyond a reasonable doubt that those aggravating factors exist. According to Petitioner, the judge's answer to the jury's question impeded the jury's use of that testimony for the additional purpose of establishing reasonable doubt upon the existence of the two aggravating factors proposed by the prosecution.

Again, the standard of *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), is instructive: "[T]he proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380, 110 S.Ct. at 1198, 108 L.Ed.2d at 329. "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. 350, 368, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290, 306 (1993) (quoting *Boyde*, 494 U.S. at 381, 110 S.Ct. at 1198.).

Under *Lockett*, the U.S. Supreme Court held that, consistent with the Eighth and

Fourteenth Amendments, a sentencer in a capital case may "not be precluded from considering, as *a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964–5, 57 L.Ed.2d at 990; *see also Eddings,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1. Applying the precedent established in *Lockett* and its progeny, the U.S. Supreme Court held in *Penry II* that under the Eighth and Fourteenth Amendments, the jury must "be able to 'consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence.' For it is only when the jury is given a 'vehicle for expressing its reasoned moral response' to that evidence in rendering its sentencing decision, that we can be sure that the jury 'has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence.'" *Penry II,* 532 U.S. 782, 121 S.Ct. at 1920, 150 L.Ed.2d 9 (quoting *Penry I,* 492 U.S. at 319, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256) (citations omitted).

Petitioner argues that because the court's answer directed the jury to ignore the expert testimony for the purpose of defeating the existence of the government's aggravating factors, the mitigating evidence was not given its full effect as required under *Penry II,* 532 U.S. 782, 121 S.Ct. at 1920, 150 L.Ed.2d 9.

In *Penry II,* the U.S. Supreme Court addressed the Texas sentencing scheme previously held to violate the 8th Amendment because the three statutorily-mandated questions under this sentencing procedure failed to provide a vehicle for a "reasoned moral response" to mitigating evidence. The Court held that, among other things, none of the questions was broad enough to allow a sentencing jury to consider and give effect to mitigating evidence. Following the reversal of Penry's sentence, the Texas trial court attempted to satisfy the criticisms in *Penry I* by giving a supplemental instruction to the second jury to "consider" the mitigating circumstances. However, the verdict form contained the same three special issues and gave the jury the choice of answering yes or no to each question. The trial judge told the second jury that if it decided death were inappropriate it could simply answer one or more of the questions in the negative. The Supreme Court later held that the nullification instruction made the jury charge as a whole internally contradictory and reversed the sentence for a second time.

*Penry* is distinguishable from these circumstances. Here, Petitioner was allowed to argue to the jury the existence of four statutorily-delineated mitigating factors, including a catch-all factor open to any evidence that the jury considered to be of mitigating value. The Martini jurors had the benefit of multiple instructions, directions to give full effect to mitigating evidence throughout their deliberations. As example, the trial judge gave the following relevant instructions regarding mitigating evidence:

> Now, ladies and gentlemen, your decision on punishment is based upon your consideration of what are called aggravating and mitigating factors. As a general proposition aggravating factors are those which would tend towards imposing the death penalty, and mitigating factors are those which would tend towards the sentence of imprisonment for life. The factors have to do with the circumstances of the crime, personal traits, qualities and background of the defendant.
>
> Your task is not merely to decide the existence of aggravating and mitigating

factors, but rather we call upon you to evaluate those factors in making the unique, individualized judgment about the appropriateness of either the death penalty or imprisonment as a punishment for this defendant.

The defendant does not have the burden of proving that he should be permitted to live. The ultimate burden rests upon the State to convince you beyond a reasonable doubt that the death penalty is the fitting and appropriate punishment in this case.

(54T 60–23 to 61–17.)

\* \* \* \* \* \*

A reasonable doubt is an honest and reasonable uncertainty as to the presence of an aggravating factor or as to the results of a balancing of factors process existing in your minds after you've given full and impartial consideration to all of the evidence that you're permitted to utilize.

Now, reasonable doubt may arise from the evidence itself or from a lack of evidence.

Now, the evidence to be considered by you includes that material presented by both sides at both phases of the trial, all of the witnesses and all of the physical evidence.

(54T 62–8 to 19.)

\* \* \* \* \* \*

You can use anything that you've heard, even if it's not presented by counsel as a mitigating factor, if you believe it is there.

(54T 63–19 to 21.)

\* \* \* \* \* \*

If there is evidence of a mitigating factor you must consider that evidence and give it such weight as you as you [sic] deem appropriate. In other words, if any evidence has been presented with respect to a mitigating factor and you find the mitigating factor to be present, you are bound by the law to consider it and weigh it against any aggravating factor or factors you have found to be present.

Further, it is important to remember that evidence of the presence of mitigating factors is not offered to justify or excuse a defendant's conduct. Rather it is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the murder that would justify a sentence less than death.

In considering a mitigating factor you may also take into account such sympathy as the mitigating factor may inspire.

(54T 70–24 to 14.)

\* \* \* \* \* \*

Mitigating factor (d) is not merely a single factor. Rather it requires that you consider all the evidence received as it relates to or concerns the defendant's life, his characteristics or background and the totality of the circumstances of the crime as well as the defendant's potential for rehabilitation.

(54T 74–16 to 21.)

\* \* \* \* \* \*

Now, each juror must decide whether the law requires that the defendant must be put to death or not. A death verdict cannot be the product of a mechanical application of the statute. Rather such a verdict can result only if it is a reflection of your judgment that death is the fitting and appropriate punishment.

You're not merely fact finders. You are the ultimate determiners of whether the defendant shall live or die. You cannot avoid that ultimate determination by merely making factual findings. Your job is not merely to decide the existence of aggravating and mitigating factors, but to evaluate the evidence sup-

porting those factors in making the unique, individualized judgment regarding the appropriateness of the death penalty.

(54T 78–13 to 79–1.)

The jury was given thorough, unobjected instructions that addressed the role of mitigating and aggravating factors. The evidence to demonstrate these factors could come from anything presented by both sides at both phases of the trial, all witnesses and physical evidence, whether referred to or not by counsel. The jury was instructed on the "unique, individualized judgment" it must make about the appropriateness of the death penalty that should follow an evaluation of the existence of any mitigating and aggravating factors. With specific regard to mitigating factors, the jury was instructed that it could consider "anything that [it] heard" in addition to being instructed on the catch-all mitigating factor that allowed it to consider "all the evidence received as it relates to or concerns the defendant's life, his characteristics or background and the totality of the circumstances of the crime as well as the defendant's potential for rehabilitation."

The trial judge's answer to the question may have been ambiguous but considering the instructions as a whole, it did not ultimately limit the defense' ability to make use of the expert testimony as mitigating evidence. Defense counsel was given full opportunity to rebut the aggravating-factor evidence offered by the state and used it to argue against the existence of the aggravating factors. *See Buchanan v. Angelone*, 522 U.S. 269, 278, 118 S.Ct. 757, 762, 139 L.Ed.2d 702 (1998) (Where two days of testimony relating to petitioner's family background and mental and emotional problems was presented, the Court found it unlikely that a jury would disregard this mitigating evidence even if the instructions were unclear.). These instructions in conjunction with the defense counsel's opportunity to rebut the

prosecution's aggravating factors with this evidence allowed the jury to express a "reasoned moral response" to the death penalty decision. *Penry I*, 492 U.S. at 328, 109 S.Ct. at 2952, 106 L.Ed.2d at 284 (citing *Franklin v. Lynaugh*, 487 U.S. 164, 184, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155, 172) (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987)). Consequently, this Court does not find that there is a reasonable likelihood that the challenged instruction prevented or impeded the consideration of constitutionally relevant evidence.

■ Also, as Respondents vigorously argue, there is no federal precedent that requires trial courts to instruct a jury to utilize mitigating evidence when initially deciding whether aggravating factors exist rather than waiting to weigh this evidence against the aggravating factors the jury finds. Rather, "the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan*, 522 U.S. at 276, 118 S.Ct. at 761; *see also, Johnson v. Texas*, 509 U.S. 350, 372, 113 S.Ct. 2658, 2671, 125 L.Ed.2d 290, 309 (1993).

To rebut Respondent's arguments that other instructions given to the jury made any error harmless, Petitioner contends that it does not matter whether the jury was impeccably instructed initially if at some time an ambiguous instruction by the trial judge is given. He further charges that regardless of what the earlier instructions had been, the Court when giving supplemental instructions must "clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). " 'The influence of the trial judge on the jury is necessarily and properly of great weight,' and jurors are ever watchful

of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge.'" *Id.* at 612, 66 S.Ct. at 405 (quoting *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894)). Also, Petitioner relies on *McDowell v. Calderon*, 130 F.3d 833 (9th Cir.1997), *cert. denied*, 523 U.S. 1103, 118 S.Ct. 1575, 140 L.Ed.2d 807 (1998), that the jury's confusion in a capital sentencing proceeding as to whether it could consider certain evidence as mitigating and the judge's failure to adequately correct the jury's clear misconception resulted in an Eighth Amendment violation.

■■■ This Court recognizes that the trial court should give special care in giving a supplemental instruction; however, the mere fact that an error was made in a supplemental instruction "does not automatically mean that the jury has been unduly influenced by it." *Rock v. Coombe*, 694 F.2d 908, 915 (2d Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 345 (1983). Rather, "the instructions have to be considered as a whole and the supplemental instruction examined in the light of the other instructions previously given." 2 Charles A. Wright, *Federal Rules of Criminal Procedure*, § 502 (2000); *see also Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."); *Rock*, 694 F.2d at 915 ("The supplemental charge itself should be viewed as a whole and the offending statement read in context in order to evaluate its likely effect on the jury."); *U.S. v. Hawes*, 529 F.2d 472, 483 (5th Cir.1976) (viewed "the main charge and the supplemental charge as a whole" to determine that the supplemental instruction would

not leave an erroneous impression on the minds of the jury); *Smith v. U.S.*, 456 F.2d 121, 122 (3d. Cir.1972) (determined after examining "the original charge together with the supplemental charge" that the any error committed in the supplemental charge was harmless).

As this Court has described, the instructions on mitigating evidence given to the jury an hour and a half before the supplemental instruction were clear, thorough and unobjected and provided clarity to any ambiguity in the supplemental instruction.

Unlike *Bollenbach* and *McDowell*, the circumstances here do not indicate that the jury was unduly influenced by any error that may have existed in the supplemental instruction. In *Bollenbach*, after the jurors had been deliberating for seven hours, they returned to the Court "to report that they were 'hopelessly deadlocked'", the trial judge gave them an erroneous description of the law in his response to a question posed by the jury. The jury then returned with a guilty verdict five minutes after this erroneous instruction was given. In *McDowell*, the jury's question at issue was posed to the judge on the third day of deliberations. The jury's confusion as to the law and whether certain evidence was mitigating was evident through the question that they asked; however, the trial judge refused to correct their misconception and instead, referred them back to earlier instructions.

Unlike the *Bollenbach* and *McDowell* scenarios, the question here was posed relatively soon after the jury heard clear instructions on the relevant law; the Martini jury asked the questions at issue an hour and an half after deliberations began. The direction given by the judge was not an absolute misrepresentation of the law as in *Bollenbach*. Nor does this case involve responding to a jury's clear misconception of the law as in *McDowell*. No

verdict was returned within five minutes or any short time after the judge's answer. Instead, the jury continued to deliberate, adjourned sometime after, returned the following day, resumed deliberations and returned a verdict later that day. In sum, considering the instructions as whole and the timing of the supplemental instruction, any error in the supplemental instruction was harmless. And this is what the New Jersey Supreme Court determined from its review.

With that *actual* state of what the jury was told and those *actual* circumstances of the jury's deliberations, the New Jersey Supreme Court did not unreasonably apply clearly established federal law nor did it make an unreasonable determination of the facts.

### VII. Denial of Due Process of Law by Barring the Public Defender from Presenting Relevant Expert Testimony

■■■ Petitioner argues that he was denied due process of law because he was barred by the trial judge during the PCR hearing from presenting expert testimony to support his argument that the evidence at issue was mitigating.

After independently evaluating the two expert reports submitted by the Public Defender, the New Jersey Supreme Court held that the trial judge did not abuse its discretion in excluding the expert testimony or the reports:

> We find that the reports are cumulative and add little to the Public Defender's arguments. Because the reports reflect the experts' anticipated testimony, and because expert testimony is only admissible if it 'will assist the trier of fact to understand the evidence or determine a fact in issue.' N.J.R.E. 702; *see also State v. Kelly*, 97 N.J. 178, 208, 478 A.2d 364 (1984), we cannot say the trial court abused its discretion in excluding the

experts or the reports. In this case, there was ample testimony at the PCR hearing from Martini's prior counsel and others about the possible value of the proffered evidence in a penalty-phase trial.

*Martini V,* 160 N.J. at 263, 734 A.2d 257.

The purpose of the PCR hearing was to determine whether certain evidence was mitigating and if so, whether the defense counsel's failure to obtain the evidence constituted ineffective assistance of counsel or whether the omission of the evidence constituted a manifest injustice and a violation of the Defendant's constitutional rights.

The Public Defender provided Lois Nordone and Diana Aviv, social workers with experience in mitigation investigations in capital cases with both the evidence and various other documents in order to seek their opinion and their testimony as to the evidence—whether it was mitigating or to justify an answer to the questions presented by the state supreme court in *Martini IV.* The trial judge ultimately held that though it would admit the reports drafted by these two experts into evidence, it would not hear any expert testimony because it felt that it did not need the help of experts.

Petitioner essentially complains that his due process rights under the 5th Amendment were violated because the Court prevented the full and fair litigation of claims relating to ineffective assistance of counsel. He argues that one of the most basic aspects of due process is the right to present evidence which is also guaranteed by the Compulsory Process Clause of the 6th Amendment. Petitioner claims that the right to offer testimony of witnesses is the right to present a defense. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). And, this right

should be vindicated in PCR hearings as well as trials.

Respondents argue that there is no federal precedent that requires proffers of evidence to be in testimonial form. And, this precedent cannot be reconciled with *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), which disallows interference with state evidentiary rulings. The state supreme court reviewed the reports of the mitigation specialists and independently ascertained that the contents were cumulative of the arguments made by the Public Defender. Hence, Petitioner was allowed to present evidence (expert reports) and make arguments that established the points that would have been made through the testimony.

In addition, Respondents argue that Petitioner waived his right to any issue concerning the exclusion of the social worker's testimony because during the PCR hearing, Petitioner argued through his special counsel that the Public Defenders should not be allowed to offer testimony of their two mitigation specialists.

 This Court does not find that Petitioner's due process rights have been violated. First, there is no constitutional right to evidence in oral, testimonial form. Petitioner was able to submit the reports of the same experts that Petitioner wanted oral testimony from. Moreover, as the state court stated, expert evidence is to be admitted when it assists the trial judge in understanding the evidence or determining a fact in issue. This evidence was independently reviewed by the New Jersey Supreme Court and found to be of cumulative weight which would "add little to the Public Defender's arguments." *Martini V*, 160 N.J. at 263, 734 A.2d 257. Petitioner had been given the opportunity to present other evidence that established the points that could have been made through the expert testimony. The New Jersey Supreme Court's determination has not been shown by Petitioner to be an unreasonable application of clearly established federal precedents or an unreasonable determination of the facts in light of the evidence.

## CONCLUSION

The petition for writ of habeas corpus is denied. Petitioner has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253. Accordingly, no certificate of appealability shall issue.

## ORDER

Petitioner John Martini, Sr. moves for relief under 28 U.S.C. § 2254. For the reasons given in this opinion,

It is on this ___ day of March, 2002,

ORDERED that the petition is DENIED; and it is further

ORDERED that no certificate of appealability shall issue.